[No. B220320. Second Dist., Div. Four. Dec. 8, 2010.]

CARLYLE HALL, Plaintiff and Appellant, v.
LAWRENCE KALFAYAN, Defendant and Respondent.

COUNSEL

Lapidus & Lapidus and Daniel C. Lapidus for Plaintiff and Appellant.

Waxler ◆ Carner ◆ Brodsky, Barry Z. Brodsky and Brian D. Peters for Defendant and Respondent.

OPINION

**EPSTEIN, P. J.**—In this case, we conclude that a prospective beneficiary of a will cannot maintain a cause of action for legal malpractice against the attorney who drafted the will but did not have it executed before the death of the testator.

## FACTUAL AND PROCEDURAL SUMMARY

Appellant Carlyle Hall had known Alexandra Turner since 1962 or 1963. In the late 1990's, Hall formed the belief that Ms. Turner was in need of a conservatorship; she had become increasingly reclusive, sometimes would not answer the telephone or the door, and was not cleaning up when her dog relieved himself inside her condominium. She exhibited signs of dementia.

In December 2001, Hall, through counsel, filed a petition to establish a conservatorship for Ms. Turner. The petition requested that Hall and Judith Chinello, a professional conservator, be appointed coconservators of Ms. Turner's person, and that he be appointed conservator of her estate. In January 2002, respondent Lawrence Kalfayan was appointed as a probate volunteer panel (PVP) attorney to represent Ms. Turner's interests with respect to the conservatorship petition.

With Hall's assistance, Kalfayan met with Ms. Turner in February 2002. Her condominium was unclean and smelled strongly of dog and she had almost no food in her refrigerator. According to Kalfayan's report to the

court, "Mrs. Turner had difficulty remembering the topic of discussion, and during any given conversation, would ask 'what were we talking about?' She could not remember how long she had lived in her present dwelling, or where she lived prior to her current residence. She did not know what a conservatorship proceeding is, and did not know of the upcoming court hearing on February 14, 2002 and she appeared surprised when told of it." Although Ms. Turner expressed opposition to a conservatorship arrangement, "[s]he did express a strong interest in having Carlyle Hall 'be the one to help her,' but only at such time as she needs help." Kalfayan showed Ms. Turner a copy of an attachment to the petition in which she nominated Hall as conservator of the estate, and Hall and Chinello as conservators of her person; she did not recall signing the document and was confused as to its meaning. Ms. Turner confirmed she had a strong and long-lasting friendship with Hall, and stated "more than once during the meeting, that she trusts him completely and wants him to assist her—but only at such time as she needs it." Kalfayan confirmed Ms. Turner's lengthy positive relationship with Hall in interviews with Turner's ex-husband, her accountant, and her niece.

Kalfayan asked Ms. Turner about her family. She mentioned a brother who was deceased, and when asked, recognized the name of her niece, Priscilla Waring. Ms. Turner told Kalfayan that she liked Priscilla but that they had not kept in contact since Ms. Turner moved to California. Asked about having Priscilla help her, Ms. Turner said she would not be comfortable with that, since Priscilla lives far away and they had not been in contact for a long time. Asked about two other individuals, Ms. Turner identified them as her two younger adopted siblings. She said she did not have a close relationship with either one and was not in contact with them. During this meeting, Ms. Turner told Kalfayan she wanted to leave a 17th-century Japanese screen to Mr. Hall.

Kalfayan recommended a conservatorship, with Hall as conservator. He identified Ms. Turner's needs as including help paying bills, housekeeping, obtaining groceries, and obtaining medical care when needed. On March 6, 2002, the probate court appointed Hall to be Ms. Turner's conservator. The court discharged PVP Attorney Kalfayan, but ordered him to be notified "if the Conservatee is moved to a secured facility or if proceedings concerning the Conservatee's estate planning documents are initiated . . . ."

In 2004, Sean Higgins, who represented Hall as conservator, informed Kalfayan that given Ms. Turner's financial, physical and mental circumstances, Hall wished to proceed with the petition for substituted judgment (PSJ)[1] procedure to prepare and obtain court approval of an estate plan for Ms. Turner. Hall arranged for Kalfayan to meet with Ms. Turner in November

---

[1] The substituted judgment provisions in the Probate Code (§§ 2580–2586) are designed to protect the conservatorship estate for the benefit of the conservatee, and also for the benefit of

2004 to discuss her testamentary intentions. According to Kalfayan's notes from this meeting, Ms. Turner told him Hall should inherit her condominium because she was very fond of him; her niece, Priscilla Waring, should not get anything because Ms. Turner did not like her; no relative should receive any part of her estate; and she did not know who else to give money and articles to so the remainder of the estate should go to Hall and he could decide who to give things to.

According to Sean Higgins, the conservator's attorney, he spoke with Kalfayan in February 2005, and Kalfayan stated he had prepared a draft living trust for Ms. Turner. Kalfayan later asked Higgins to arrange for another meeting with Ms. Turner to review the estate plan. Kalfayan failed to meet with Ms. Turner on the date scheduled in March 2005, apparently the result of a miscommunication with Higgins. One or two other meetings with Ms. Turner were reportedly "of little substance" because Ms. Turner was not feeling well or was not interested in discussing her estate plan.

In April 2005, Kalfayan had his final meeting with Ms. Turner. According to Kalfayan, Ms. Turner "expressed her desire to leave 'more than half' of her estate to Carlyle Hall and 'less than half' of her estate to her niece, Priscilla Waring. The expressions 'more than half' and 'less than half' were Ms. Turner's words." Asked to be more specific about the meaning of those terms, "Ms. Turner said 'a little more' to Mr. Hall and 'a little less' to Ms. Waring. She refused to discuss specifics beyond that, and made it clear that was all she cared to discuss about the matter." Kalfayan told Higgins that this last meeting had been productive, and that he would prepare a draft estate plan giving 60 percent of the estate to Hall and 40 percent of the estate to Ms. Turner's niece.

In late June 2005, Kalfayan notified the conservator's counsel that he had completed a draft of a living trust for Ms. Turner and would be transmitting it to him the next day. On August 10, 2005, Kalfayan sent Higgins the draft trust document, which provided that Hall would receive 55 percent of the estate. Higgins reviewed the draft trust and informed Kalfayan that he believed it would be "easier and more cost-effective for the petition for substituted judgment to seek approval of a will, rather than a trust." In September, Kalfayan agreed to convert the trust into a will.

In mid-October 2005, Kalfayan told Higgins he would transmit the draft will within the next week. When this was not received, Higgins sent a letter asking for a status update. On January 31, 2006, Kalfayan sent Higgins the draft will and a cover letter explaining that he had reduced the share of the

the persons who will ultimately receive it from the conservatee or his or her personal representative. (*Murphy v. Murphy* (2008) 164 Cal.App.4th 376, 397 [78 Cal.Rptr.3d 784].)

estate to Hall to 51 percent, which he believed better reflected Ms. Turner's intent. He also indicated he would explain that change in the PSJ, which he would prepare and file in his capacity as PVP attorney.

On April 3, 2006, Kalfayan was reappointed as Ms. Turner's PVP counsel. Kalfayan filed the PSJ on May 24, 2006, with a hearing date of July 24, 2006. Kalfayan sent notice of hearing to interested parties, reviewed the probate notes, and attended the initial hearing on the petition. The hearing was continued for the purpose of clearing issues raised in the probate notes.

Kalfayan filed a supplement to the PSJ on September 22, 2006. Ms. Turner's niece, Priscilla Waring, filed objections to the petition in October. Ms. Waring subsequently contacted Kalfayan and advised him that she remembered the name of her aunt's former attorney and his law firm. Kalfayan contacted the attorney who confirmed that Ms. Turner and her ex-husband had prepared an estate plan consisting of a living trust and pour-over wills. Kalfayan contacted the attorney's former law firm and ultimately obtained copies of these documents.

On February 22, 2007, Kalfayan filed a second supplement to the PSJ, attaching copies of Ms. Turner's former estate planning documents. Kalfayan noted that the will and trust contained gifts to Ms. Turner's niece, to other family members who are now deceased, and to her ex-husband and his children. No gift was made to Hall. Kalfayan explained that this disposition was relevant to the conservatee's past donative practices. He also indicated the discovery of these testamentary instruments raised issues as to other persons entitled to notice of the proceedings.

The hearing on the PSJ was continued so that Kalfayan could give notice to the heirs of Ms. Turner's former husband. Kalfayan did not locate these individuals and the court denied the petition without prejudice on June 22, 2007.

Ms. Turner died in August 2007. Her new estate plan had not been approved by the court, and thus Hall received nothing. Ms. Turner's niece, the children of her former husband, and her adopted siblings are currently involved in litigation over who is entitled to her estate.

Hall brought this action for legal malpractice, alleging that Kalfayan's failure to timely perform his duties had deprived him of the majority of Ms. Turner's estate. The trial court granted Kalfayan's motion for summary judgment on the ground that Kalfayan owed no duty to Hall, who was not his client and not the beneficiary of an executed estate plan. Hall filed this timely appeal from the judgment.

## DISCUSSION

■ Hall's first amended complaint alleged a single cause of action for professional negligence. The elements of a claim for legal malpractice are: "(1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence." (*Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194, 1199 [108 Cal.Rptr.2d 471, 25 P.3d 670].)

Kalfayan's summary judgment motion was premised on the lack of duty to Hall. He asserted as an alternative theory that Hall could not establish that Kalfayan's alleged negligence was the proximate cause of Hall's damages. The court granted the motion on the ground that there was no legal duty. We agree.

In California, as in other jurisdictions, the traditional rule was that an attorney could be held liable for professional negligence only to his or her own client. (*Chang v. Lederman* (2009) 172 Cal.App.4th 67, 76 [90 Cal.Rptr.3d 758].) But this strict privity test was rejected in a trio of cases involving testamentary instruments. In the first, *Biakanja v. Irving* (1958) 49 Cal.2d 647 [320 P.2d 16], the plaintiff's brother died after signing a will, prepared by a notary public, which purported to leave the decedent's entire estate to the plaintiff. The notary negligently failed to have the will properly attested, and it was denied probate. The plaintiff thus received only his one-eighth intestate succession share of the estate. Plaintiff sued the notary and recovered a judgment. The Supreme Court held the plaintiff should be allowed to recover, despite the absence of privity: "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (49 Cal.2d at p. 650.)

■ The second case is *Lucas v. Hamm* (1961) 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685]. In that case, an attorney was asked to draft a will under which the plaintiffs were to receive 15 percent of the residue of the estate. The attorney negligently drafted a will containing a residuary trust which violated the rule against perpetuities and statutory restraints on alienation. After the death of the testator, the attorney advised the plaintiffs that the

residual trust provision was invalid and the plaintiffs would be deprived of the entire amount to which they would have been entitled if the provision had been valid. The plaintiffs entered into a settlement with the blood relatives of the testator under which they received a lesser amount than that provided for them by the testator. They then sued the attorney for professional negligence. The Supreme Court extended the *Biakanja* principles to a negligent attorney: "As in *Biakanja*, one of the main purposes which the transaction between defendant and the testator intended to accomplish was to provide for the transfer of property to plaintiffs; the damage to plaintiffs in the event of invalidity of the bequest was clearly foreseeable; it became certain, upon the death of the testator without change of the will, that plaintiffs would have received the intended benefits but for the asserted negligence of defendant; and if persons such as plaintiffs are not permitted to recover for the loss resulting from negligence of the draftsman, no one would be able to do so and the policy of preventing future harm would be impaired." (56 Cal.2d at p. 589.) But the court added an additional factor for consideration: "whether the recognition of liability to beneficiaries of wills negligently drawn by attorneys would impose an undue burden on the profession. Although in some situations liability could be large and unpredictable in amount, this is also true of an attorney's liability to his client. We are of the view that the extension of his liability to beneficiaries injured by a negligently drawn will does not place an undue burden on the profession, particularly when we take into consideration that a contrary conclusion would cause the innocent beneficiary to bear the loss." (*Ibid.*) Thus the plaintiffs were allowed to proceed with their action against the attorney.

■ In the third case, *Heyer v. Flaig* (1969) 70 Cal.2d 223 [74 Cal.Rptr. 225, 449 P.2d 161], disapproved on other grounds in *Laird v. Blacker* (1992) 2 Cal.4th 606, 617 [7 Cal.Rptr.2d 550, 828 P.2d 691], it was alleged that the testatrix told her attorney she wanted to leave her entire estate to her two daughters, and also told him of her intended marriage. The attorney drafted a will which the testatrix signed shortly before she married. The will did not provide for her husband nor indicate the testatrix's intention not to provide for him. Upon her death, her husband claimed a portion of the estate as a posttestamentary spouse. The daughters sued the attorney, claiming he negligently failed to advise the testatrix of the consequences of a posttestamentary marriage and negligently failed to include any provision in the will as to the intended marriage. The court reaffirmed the principles set out in *Biakanja* and *Lucas*, explaining that the basis for extending tort liability to an intended beneficiary in the absence of privity was a breach of duty owed directly to the beneficiary: "When an attorney undertakes to fulfill the testamentary instructions of his client, he realistically and in fact assumes a relationship not only with the client but also with the client's intended beneficiaries. The attorney's actions and omissions will affect the success of the client's testamentary

scheme; and thus the possibility of thwarting the testator's wishes immediately becomes foreseeable. Equally foreseeable is the possibility of injury to an intended beneficiary. In some ways, the beneficiary's interests loom greater than those of the client. After the latter's death, a failure in his testamentary scheme works no practical effect except to deprive his intended beneficiaries of the intended bequests." (70 Cal.2d at p. 228.)

In these cases, the testamentary instrument had been executed; the question was whether the will or trust had been negligently prepared so as to frustrate the testator's intent. But in cases where a potential beneficiary seeks to recover for negligence where the will or trust has not been executed, courts have refused to extend liability.

In *Radovich v. Locke-Paddon* (1995) 35 Cal.App.4th 946 [41 Cal.Rptr.2d 573] (*Radovich*), the decedent had an estate plan which provided for trust income to her husband and her sister. The decedent, who had breast cancer, met with the attorney to discuss drafting a new will under which the decedent's husband would receive 100 percent of the trust income. The attorney delivered a rough draft of the will to the decedent for her review. She told the attorney she intended to talk with her sister before finalizing the provisions of the proposed new will. The decedent died several weeks later without executing a new will. Her prior will was admitted to probate. Her husband then brought this action for legal malpractice against the attorney, claiming he was dilatory and negligent in preparing and failing to obtain the decedent's due execution of the draft will.

The court distinguished *Biakanja, Lucas,* and *Heyer* because in those cases the will had been signed by the decedent. (*Radovich, supra,* 35 Cal.App.4th at p. 959.) The court noted there were "both practical and policy reasons for requiring more evidence of commitment than is furnished by a direction to prepare a will containing specified provisions. From a practical standpoint, common experience teaches that potential testators may change their minds more than once after the first meeting. Although a potential testator may also change his or her mind *after* a will is signed, we perceive significantly stronger support for an inference of commitment in a signature on testamentary documents than in a preliminary direction to prepare such documents for signature. From a policy standpoint, we must be sensitive to the potential for misunderstanding and the difficulties of proof inherent in the fact that disputes such as these will not arise until the decedent—the only person who can say what he or she intended—has died. Thus we must as a policy matter insist on the clearest manifestation of commitment the circumstances will permit." (*Id.* at p. 964.) The court also observed that "imposition of liability in a case such as this could improperly compromise an attorney's primary duty of undivided loyalty to his or her client, the decedent." (*Id.* at p. 965.)

Under the circumstances presented, the court held the attorney owed no duty to the potential beneficiary husband. (See also *Boranian v. Clark* (2004) 123 Cal.App.4th 1012, 1019 [20 Cal.Rptr.3d 405] [extension of an attorney's duty to a third party could compromise attorney's "primary duty of undivided loyalty by creating an incentive for him to exert pressure on his client to complete her estate planning documents summarily, or by making him the arbiter of a dying client's true intent"].)

The same court that decided *Radovich* reached a different conclusion, based on the existence of an executed will, in *Osornio v. Weingarten* (2004) 124 Cal.App.4th 304 [21 Cal.Rptr.3d 246]. In *Osornio*, the decedent was a dependent adult who had her attorney draft a will naming her care custodian, Ms. Osornio, as the executor and sole beneficiary of her estate. The attorney negligently failed to advise the decedent that her intended beneficiary would be a presumptively disqualified donee because she was a care custodian, and failed to take appropriate measures so that the testator's wishes could be carried out. The bequest failed, and Ms. Osornio sued the attorney for professional negligence. The court held that the extension of liability to a nonclient in this instance would not impose an undue burden on the legal profession. The court distinguished the situation in *Radovich*, where the nonclient was a merely a potential beneficiary under an unsigned draft will, to the case before it, where there was a clear expression of the decedent's intent that Ms. Osornio be her sole beneficiary under a signed will. (124 Cal.App.4th at p. 336.) The court found none of the ambiguity concerning the testator's donative intent as was present in *Radovich*. "The attorney's duty here was to take appropriate action to carry out the testator's wishes—that were *expressed and formalized* in her signed will—that her intended beneficiary, Osornio, inherit her entire estate." (*Ibid.*)

The factual distinction between *Radovich* and *Osornio* guided the decision in *Chang v. Lederman, supra,* 172 Cal.App.4th 67. In *Chang*, the decedent and Ms. Chang lived together for several years before marrying. The decedent, who had been diagnosed with terminal cancer, retained an attorney to prepare a revocable trust approximately six months before he married Ms. Chang. The executed trust provided for distributions of $30,000 and some personal property to Ms. Chang and $10,000 to another individual; Ms. Chang was to vacate the residence within 30 days of the decedent's death; and the property was to be sold or leased for fair market rent. The residue of the trust estate was left to the decedent's only child. A first amendment to the trust, executed a month later, reduced the sum to be distributed to Ms. Chang, eliminated the distribution to the other individual, and expressly left all other provisions of the trust unchanged. During that same period, the decedent executed a will to dispose of property he owned in Israel. After his marriage to Ms. Chang, the decedent executed a second will in Israel which apparently did not provide for her in any way and did not

expressly revoke the trust, as amended. Then, five or six months after the marriage, when the decedent was seriously ill, he instructed the attorney to revise his trust to leave the entire trust estate to Ms. Chang, with the understanding that she would give the decedent's son $250,000 when he turned 25. The attorney refused and told the decedent that if he modified the trust, the decedent would be sued by the successor trustee. The attorney also advised that the decedent should have a psychiatric evaluation before making changes to his estate plan. The decedent died a few weeks later without making any further amendments to his trust. After the will and trust were held valid, Ms. Chang sued the attorney for professional negligence, breach of fiduciary duty, and intentional infliction of emotional distress.

The court found no duty to Ms. Chang, who was only a potential beneficiary, not an expressly named beneficiary of an express bequest. "The difficulty . . . is that any disappointed potential beneficiary—even a total stranger to the testator—could make factual allegations similar in most respects to those in the second amended complaint; and, without requiring an explicit manifestation of the testator's intentions, the existence of a duty—a legal question—would always turn on the resolution of disputed facts and could never be decided as a matter of law." (*Chang v. Lederman, supra*, 172 Cal.App.4th at p. 83.) The court thus concluded that it would place an undue burden on the profession to hold that estate planners owe a duty of care to unnamed potential beneficiaries. "Without a finite, objective limit on the identity of individuals to whom they owe a duty of care, the burden on lawyers preparing wills and trusts would be intolerable." (*Id.* at p. 84.)

■ We agree with the *Radovich* and *Chang* courts that there is a need for a clear delineation of an attorney's duty to nonclients. The essence of the claim in the case before this court is that Kalfayan failed to complete the new estate plan for Ms. Turner and have it executed on her behalf by her conservator before her death, thereby depriving Hall of his share of her estate. In the absence of an executed (and in this instance, approved) testamentary document naming Hall as a beneficiary, Hall is only a potential beneficiary. Kalfayan's duty was to the conservatorship on behalf of Ms. Turner; he did not owe Hall a duty of care with respect to the preparation of an estate plan for Ms. Turner.

This conclusion is particularly appropriate in this case, where Ms. Turner herself had not expressed a desire to have a new will prepared and had only limited conversation with Kalfayan about the disposition of her estate. In addition, there is no certainty that the court would have approved the PSJ. We also observe that extending Kalfayan's duty to potential beneficiaries of Ms. Turner's estate would expose him to liability to her niece, whose share of

the estate would have been reduced. This is precisely the type of unreasonable burden on an attorney that militates against expanding duty to potential beneficiaries.

As a matter of law, Hall cannot establish duty, a necessary element for his claim for professional negligence. The trial court properly granted summary judgment on this basis.

## DISPOSITION

The judgment is affirmed. Respondent is to have his costs on appeal.

Manella, J., and Suzukawa, J., concurred.