[No. 67527-3-I.   Division One.   February 4, 2013.]

TERRY PARKS, *Appellant*, v. JANYCE LYNN FINK ET AL., *Respondents*.

*Vic S. Lam* (of *Law Offices of Vic S. Lam PS*), for appellant.

*Jeffrey A. Smyth* and *Shaunta M. Knibb* (of *Smyth & Mason*), for respondents.

¶1 LAU, J. — In this attorney negligence case, nonclient Terry Parks alleges that attorney Janyce Fink owed him a

duty of care to promptly execute the will naming him as a prospective beneficiary. To impose a duty in this case would severely compromise the attorney's duty of undivided loyalty to the client and impose an untenable burden on the attorney-client relationship. We therefore hold that an attorney owes no duty of care to a prospective beneficiary to have a will executed promptly.

### FACTS

¶2 Testator John J. Balko suffered from terminal cancer. He signed a will prepared by attorney Alan Montgomery in the presence of two witnesses and a notary public on November 9, 2005, leaving specific gifts to John Rich and Victoria Doyle and the residue of the estate to "Betty Rich" and Craig Eckland in equal shares. It is undisputed that the name "Betty Rich" was a clerical error and Balko meant "Betty Parks," his aunt.

¶3 Attorney Janyce Fink performed various legal services for Balko from 2001 until Balko's death in 2007. She met with Balko—who was hospitalized for cancer treatment—in March 2006 to discuss the "Betty Rich" error in the 2005 will. At Balko's direction, Fink drafted a new will correcting this error. Fink stated this was "essentially a 'blank' Will for [Balko] to fill in because [Fink] was concerned about the error in his 2005 Will and the fact that he was preparing to have a stem cell transplant . . . ." The draft will left Balko's estate to "Betty Parks" and contained several blanks requiring Balko's attention. Fink brought the will to Balko in the hospital on the evening of April 26, 2006.[1] Balko reviewed the document and either he or Fink handwrote into one of the blanks: "If Betty Parks does not

---

[1] Fink testified that notaries were typically available at the hospital during normal business hours Monday through Friday. Fink was not sure exactly what time she arrived on April 26, but "[i]t would have been after 5:00 because there was no notary present [at the hospital]." Fink stated that she "knew full well that there were no notaries who could attest to the witnesses' signatures in the hospital in the evening."

survive me, I give the residue of my estate as follows: <u>Terry Parks (son of Betty Parks)</u>." (Underline indicates handwriting in the blank space.)[2] Balko also filled in several other blanks, initialed each handwritten insertion, and signed and dated all of the signature blocks.

¶4 Fink testified that she did not know why Balko signed the draft will.[3] She claimed she "didn't bring it to him with the idea that this was going to be the evening that he ultimately signed this document." She stated that she "brought [the new will] to him to take and review, fill out, thinking that either the next day or the day after, he would actually sign it in front of two witnesses and have a notary available." She brought no witnesses to the April 26 meeting because she did not intend to conduct a formal signing ceremony that day. In her answer to Parks's interrogatories, Fink stated, "There was no intention to execute a final Will at that time — I knew full well that there were no notaries who could attest to the witnesses' signatures in the hospital in the evening." Fink stated her "intent was for [Balko] to fill out the 'blank' Will then give the document back to [her] to type up a clean version for him to sign at a later date and in front of two witnesses and the notary." Fink stated she brought the document to Balko "for him to look at, to write anything in there if he wanted [her] to take it back and redraft it."

¶5 Fink testified that she advised Balko on April 26 that the new will was invalid until he had it witnessed and notarized. Fink testified that she "very plainly explained to [Balko] that, without two witnesses watching him sign his

---

[2] This was the first mention of Terry Parks, who was Balko's cousin. The November 2005 will made no provision for Parks. The record indicates that Balko and Parks worked together on the board of directors for a missing children's charity and that Parks spent more time with Balko as Balko's health deteriorated.

[3] Fink hired Watson Blair, an active practitioner in the area of trusts and estates, as an expert to comment on duty and standard of care for lawyers relating to preparation and execution of wills. Blair testified in his declaration, "It is not uncommon to have clients fill in blanks on a document and then write their name in the signature block (as another blank) and then give the document to the attorney to be retyped."

Will, and then expressly attest to said signing, the document was not any good and would not serve to distribute his assets upon his death." Fink left that day "knowing that [Balko] was very clear that the 2006 Draft Will was not valid" and Fink "understood that [Balko] did not want to do further work on the Will until 'he was feeling better.' "

¶6 Fink testified that she took the signed draft with her to her office for safekeeping and kept it in an envelope stamped "original." She testified she regularly stored documents for Balko because he did not want to keep documents in the hospital. Fink testified that on several occasions after April 26, she advised Balko that he should formally sign the will in front of witnesses and a notary, but Balko repeatedly refused, grew agitated, and claimed he wanted to wait until he was feeling better. Fink testified that she wrote and hand delivered three letters to Balko—in September 2006, January 2007, and March 2007—explaining each time that he should have the new will witnessed and notarized if he wanted to revoke the 2005 will.[4] She also stated that she brought other blank wills to Balko after April 2006—at least once with a notary present—but Balko "wouldn't do it. He wanted to wait until he felt better."

¶7 Alan Montgomery's declaration testimony indicates that he discussed the 2005 will with Balko in September 2006. According to Montgomery,

> [Balko] said the name "Betty Rich" in the 2005 Will was wrong, that it should have been Betty Parks, and that Betty Parks had already died leaving Craig Eckland as the main beneficiary under that will. [Balko] said that "Terry" will be his main heir instead of Craig Eckland, and needed to change his will but wanted to think about it more before doing so.

---

[4] These letters are in the record. At the end of the September 2006 letter, a signature line appears below the following statement: "I have read and understand the above letter and agree with its contents." No signature or date appears on the signature line. The January 2007 and March 2007 letters lack such a signature line. Attached to the January 2007 letter is a typewritten version of the April 2006 document containing the changes Balko handwrote while reviewing the document. Fink testified at her deposition that the attachment was "[f]or [Balko] to review and keep for his records and do with it what he wanted to."

Montgomery never discussed the April 2006 draft will with Balko and had "no knowledge about what [Balko] might have understood about its validity or how it affected the 2005 Will."

¶8 Parks disputes these facts. He submitted two declarations by Balko's girl friend, Victoria Doyle. In the first declaration, Doyle stated that because Betty Parks's health was fragile, Balko "wanted Betty Parks' son and his cousin, Terry Parks, to take Betty Parks's place in case something happened to her." Doyle claimed Balko "never wavered or changed his mind on that." Doyle stated that in April 2006, Balko came back to his hotel one day "feeling very relieved because he had just signed and finalized a new will Ms. Fink had prepared and brought to him at the hospital." Doyle claimed Balko assured her that all wills and legal papers were taken care of and were stored at Fink's office. Doyle claimed that when Balko's health worsened, Fink "began panicking about the fact that [Balko] might never wake up from his coma." Doyle claimed that around the time Balko died, Fink suggested that Doyle and Parks sign the 2006 will and then "find" the will.

¶9 In her second declaration, Doyle testified that in early 2006, she and Balko learned that Betty Parks was terminally ill. Doyle stated that shortly after learning this, Balko told her he was going to add Terry Parks to his will in case Betty predeceased him. Doyle stated that in April 2006, Balko told her he "was relieved because his will was signed and everything was in order."

¶10 Parks also submitted declarations by his wife, Elizabeth,[5] and Betty Parks's live-in caretaker, Lisa Kane. Elizabeth stated that in July 2007, Parks called her and told her that "Mr. Balko's lawyer, Ms. Janyce Fink, had just told him he was the main beneficiary in Mr. Balko's will." Kane testified that she knew "without a shadow of a doubt that Mr. Balko wanted his money to go first to Betty Parks after

---

[5] We use first names for clarity.

his death, but if she passed away before Mr. Balko, Mr. Balko wanted his money to go to Mr. Terry Parks, who could use the money for the missing children charity."

¶11 In Parks's responses to Fink's first set of interrogatories, he claimed that on July 10, 2007, Fink "told [him] in private that Mr. Balko's will was in order and that [he] was the main beneficiary." He also claimed that on July 11, Fink "told [him] that she and [he] would be co-executors or co-personal representatives for Mr. Balko's estate." According to Parks, Fink told him they "needed to find the notarized and witnessed 2006 will" and Fink "said that she gave Mr. Balko the 2006 will that was signed but not witnessed to have it witnessed and notarized." Parks claimed that on July 12, doctors told them they should consider taking Mr. Balko off life support and Fink "asked whether [they] could get the doctors to make Mr. Balko 'lucid' so that we can get the will signed and witnessed." Parks also claimed that on July 14, after the decision to take Mr. Balko off life support, Fink spoke with him in private and "suggested that she would leave the unwitnessed 2006 will in Mr. Balko's hotel room, and Laurie Doyle and [he] could sign as witnesses on the 2006 will and 'find' the 2006 will before our scheduled dinner the next day . . . ." Parks also claimed Fink asked him to sign an agreement to hire a lawyer to represent Fink and Parks and hopefully get "the 2006 will probated in court even though it was not witnessed or notarized." A copy of this purported agreement appears in the record but is not signed or initialed by any of the parties. The agreement states only that Dussault Law Group will serve as attorney for Fink and Parks "with regard to Probate of the Estate of [Balko]." A letter from Fink to Dussault also appears in the record. In that letter, Fink acknowledged signing the attorney-client fee agreement and stated that she and Parks were going to Balko's safe deposit box to inventory its contents.

¶12 Regarding Parks's allegations regarding her conduct around the time Balko died, Fink stated that because of

Balko's history of "having gone independently to Al Montgomery to have the 2005 Will prepared, [she] was not 100% certain that [she] knew what all he had done in regards to Wills . . . ." After Balko died, Fink wanted to find out if he had formalized another will before his death, so she asked Parks and Doyle to "keep an eye out for documents that were notarized and/or witnessed, and, later, mentioned to them [she] was interested in finding documents dated April 2006." Fink stated that she and Parks hired a lawyer to advise them on gathering Balko's original paperwork. She stated she told Parks about the April 2006 draft will only after they both consulted with the lawyer. She claimed she urged Parks to continue looking through Balko's belongings because she "was wondering if, without telling [her], [Balko] had executed a valid Will after April 2006."

¶13 Balko lived for more than a year after he filled in the blanks on the April 2006 will. He died in July 2007 without ever having it witnessed or notarized. The November 2005 will—which made no provision for Parks—was admitted to probate and fully administered over Parks's objection. Parks filed a malpractice lawsuit against Fink and Fink Law Group PLLC, alleging that Fink's legal representation of Balko "gave rise to a duty of reasonable care to Balko as her client as well as to Parks as the intended primary beneficiary under [Balko's] will" and that Fink breached this duty.[6] Fink moved for summary judgment dismissal, arguing that because Parks was never her client, she owed him no duty of care.

¶14 The trial court granted Fink's motion and dismissed Parks's legal malpractice claim on lack of standing grounds. In its oral ruling—later incorporated into its written rul-

---

[6] In her amended answer, Fink alleged counterclaims, including civil assault and outrage. She claimed Parks threatened, intimidated, and terrorized her on several occasions, including sending her a letter containing death threats and insults. The court dismissed the assault counterclaim but concluded the outrage counterclaim survived summary judgment. The court severed the outrage counterclaim from Parks's legal malpractice claim. The counterclaim is not at issue in this appeal.

ing—the court decided on policy grounds that to expose an attorney to liability to a nonclient potential beneficiary when a signed will has not been witnessed or notarized "burden[s] the [legal] profession with untenable conflicts of interest." Report of Proceedings (July 7, 2011) at 8. Parks appeals.

## ANALYSIS

### Standard of Review

¶15 We review a summary judgment order de novo, performing the same inquiry as the trial court and considering facts and reasonable inferences in the light most favorable to the nonmoving party. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is proper if no genuine issue of material fact remains and the moving party is entitled to judgment as a matter of law. CR 56(c). A genuine issue of material fact exists where reasonable minds could differ regarding the facts controlling the outcome of the litigation. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). The nonmoving party may not rely on mere allegations, denials, opinions, or conclusory statements but must set forth specific, admissible facts indicating a genuine issue for trial. CR 56(e); *Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co.*, 122 Wn. App. 736, 744, 87 P.3d 774 (2004).[7]

---

[7] The parties each made motions to strike below. Fink moved to strike declarations by Kane, Doyle, Elizabeth Parks, Richard Tizzano, Bruce Moen, Vic Lam, and William Broughton on grounds including hearsay, lack of personal knowledge, relevancy, and speculation. Parks moved to strike portions of Fink's declarations, interrogatory answers, and deposition testimony based on the dead man's statute, RCW 5.60.030. The court struck one allegation in Elizabeth Parks's declaration on hearsay grounds. We note that "materials submitted to the trial court in connection with a motion for summary judgment cannot actually be stricken from consideration as is true of evidence that is removed from consideration by a jury; they remain in the record to be considered on appeal. Thus, it is misleading to denominate as a 'motion to strike' what is actually an objection to the admissibility of evidence that could have been preserved in a reply brief rather than by a separate motion." *Cameron v. Murray*, 151 Wn. App. 646, 658, 214 P.3d 150 (2009).

*Evidentiary Issues*

■ ¶16 Parks contends that the dead man's statute, RCW 5.60.030, prevents the admission of Fink's "self-serving testimony"—contained in her declarations, interrogatory answers, and deposition testimony concerning her interactions with Balko—such that summary judgment was inappropriate. Appellant's Reply Br. at 6. The dead man's statute provides:

> No person offered as a witness shall be excluded from giving evidence by reason of his or her interest in the event of the action, as a party thereto or otherwise, but such interest may be shown to affect his or her credibility: PROVIDED, HOWEVER, That in an action or proceeding where the adverse party sues or defends as executor, administrator or legal representative of any deceased person, or as deriving right or title by, through or from any deceased person, or as the guardian or limited guardian of the estate or person of any incompetent or disabled person, or of any minor under the age of fourteen years, then a party in interest or to the record, shall not be admitted to testify in his or her own behalf as to any transaction had by him or her with, or any statement made to him or her, or in his or her presence, by any such deceased, incompetent or disabled person, or by any such minor under the age of fourteen years: PROVIDED FURTHER, That this exclusion shall not apply to parties of record who sue or defend in a representative or fiduciary capacity, and have no other or further interest in the action.

RCW 5.60.030. We review the admissibility of evidence in summary judgment proceedings de novo. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998).

■ ■ ¶17 The purpose of the dead man's statute is to prevent interested parties from giving self-serving testimony regarding conversations and transactions with the deceased because the dead cannot respond to unfavorable testimony. *Hofsvang v. Estate of Brooke*, 78 Wn. App. 315, 318, 897 P.2d 370 (1995); *Erickson v. Robert F. Kerr, MD, PS*, 125 Wn.2d 183, 187, 883 P.2d 313 (1994). By its terms, the

statute applies only when an adverse party sues or defends as a representative or successor of the deceased person. 5A KARL B. TEGLAND WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 601.18, at 313-14 (5th ed. 2007); RCW 5.60.030.

¶18 Here, Parks, the plaintiff, sued in his own capacity as a third party beneficiary of Fink's representation of Balko. He is asserting claims on his own behalf, not on behalf of Balko's estate. The dead man's statute does not apply. *Leipham v. Adams*, 77 Wn. App. 827, 833, 894 P.2d 576 (1995); *Erickson*, 125 Wn.2d at 189-90 (when a party sues in his or her own capacity, dead man's statute does not apply).

*Duty*

*Lawyer's Duty to Nonclient*

¶19 Parks contends that Fink owed him a duty to properly execute the will by having it witnessed either at the time Balko signed it in April 2006 or in the following 15 months before Balko's death in July 2007.[8]

¶20 The elements for a legal malpractice claim are

(1) [t]he existence of an attorney-client relationship which gives rise to a duty of care on the part of the attorney to the client; (2) an act or omission by the attorney in breach of the duty of care; (3) damage to the client; and (4) proximate causation between the attorney's breach of the duty and the damage incurred.

*Hizey v. Carpenter*, 119 Wn.2d 251, 260-61, 830 P.2d 646 (1992).

---

[8] In defining the duty he alleges Fink owed him, Parks claims that Fink "fail[ed] to have the 2006 Will *properly* executed *when the execution actually occurred* on April 26, 2006." Appellant's Br. at 18. He claims this case is about "improper execution at the time of execution" and argues the duty here was "to have [the] will executed *properly* at the time of will signing or execution." Appellant's Br. at 19. In essence, his argument is that Fink should have executed the will on the day Balko signed it or during the ensuing 15 months before Balko's death. In either case, his argument depends on the proposition that Fink had a duty to promptly execute the will after Balko signed it.

¶21 The duty issue here turns on a single question of law—whether Fink owed nonclient Parks a duty of care to ensure that the decedent executed his will promptly. The existence of a duty is a question of law. *Folsom*, 135 Wn.2d at 671. The general rule is that only an attorney's client may bring an action for attorney malpractice. *Strait v. Kennedy*, 103 Wn. App. 626, 630, 13 P.3d 671 (2000) (citing *Trask v. Butler*, 123 Wn.2d 835, 839-40, 872 P.2d 1080 (1994)). "But an attorney may owe a nonclient a duty even in the absence of this privity." *In re Guardianship of Karan*, 110 Wn. App. 76, 81, 38 P.3d 396 (2002) (citing *Stangland v. Brock*, 109 Wn.2d 675, 680, 747 P.2d 464 (1987)).

¶22 In *Trask*, our Supreme Court adopted a multifactor balancing test to determine whether an attorney owes a duty to a nonclient:

1  The extent to which the transaction was intended to benefit the [nonclient] plaintiff;

2  The foreseeability of harm to the plaintiff;

3  The degree of certainty that the plaintiff suffered injury;

4  The closeness of the connection between the defendant's conduct and the injury;

5  The policy of preventing future harm; and

6  The extent to which the profession would be unduly burdened by a finding of liability.

*Trask*, 123 Wn.2d at 843. The analysis of these factors necessarily involves an individualized factual determination in each case.[9] *Trask*, 123 Wn.2d at 845.

---

[9] Two Court of Appeals cases distinguished *Trask*, holding that in the guardianship context, an attorney hired by the guardian owes a duty to the ward to comply with certain statutory provisions in establishing the guardianship. *See Estate of Treadwell v. Wright*, 115 Wn. App. 238, 247, 61 P.3d 1214 (2003); *Karan*, 110 Wn. App. at 86. In *Treadwell*, we explained that unlike the estate beneficiaries in *Trask*, the incompetent ward in a guardianship proceeding is the intended beneficiary of the representation:

[T]he incompetence of the ward is the key fact. Treadwell was the intended beneficiary of the guardianship [the attorney] established because she was (1) a legally incompetent ward, (2) in a nonadversarial relationship with [her

¶23 At issue in this case are factors five and six, noted above. Because material issues of fact exist on whether Parks was an intended beneficiary, we assume, without deciding, that Parks was an intended beneficiary under Balko's will. As such, factor one is not before us and factors two, three, and four are unchallenged on appeal.

¶24 In this case, our examination of factors five and six requires us to consider the policy conflict[10] between the prevention of future harm to attorney malpractice victims and the burden imposed on the legal profession by imposing liability. For the reasons discussed below, we join the majority of courts confronting this issue in holding that an attorney owes no duty of care to an intended will beneficiary to have the will executed promptly.

¶25 To support his duty claim, Parks relies on several non-Washington cases in which the courts imposed a duty.[11]

---

guardian], and (3) because [the attorney's] legal services for [her guardian] solely consisted of setting up Treadwell's guardianship.

*Treadwell*, 115 Wn. App. at 245. Importantly, *Treadwell* reiterated that the *Trask* six-factor analysis requires an individualized factual determination: "the trial court should apply the *Trask* test and determine whether such a duty exists *as each type of transaction is put before it*." *Treadwell*, 115 Wn. App. at 247 (emphasis added).

In *Karan*, Division Three of this court distinguished *Trask*:

The *Trask* case resolved a dispute between an adult, competent beneficiary of a will who was in an adversarial relationship with another adult beneficiary. The second beneficiary was also both the personal representative of the deceased father's estate and attorney-in-fact for the surviving mother. And the lawsuit against the lawyer was over day-to-day judgment calls in managing the estate.

*Karan*, 110 Wn. App. at 84 (citation omitted). The factual circumstances were critical to the decision. *Treadwell* and *Karan* underscore the fact-specific analysis required under *Trask*.

[10] The absence of policy conflict distinguishes *Trask* and *Stangland*, a case *Trask* relies on, from the present case.

[11] *See Osornio v. Weingarten*, 124 Cal. App. 4th 304, 335-36, 21 Cal. Rptr. 3d 246 (2004) (attorney of dependent adult drafted will naming care custodian as the executor and sole beneficiary of her will—duty owed to nonclient based on attorney's negligence in failing to advise decedent that care custodian was presumptively disqualified as done under probate code and to take remedial action to overcome the presumption); *Auric v. Cont'l Cas. Co.*, 111 Wis. 2d 507, 514, 331 N.W.2d 325 (1983) (testator undisputedly went to attorney's office specifically

None of those cases control because they are factually and legally distinguishable from the present case. Most of the cases Parks cites involve drafting errors. None involve the critical duty issue here—whether a duty is owed to an intended beneficiary where the attorney fails to ensure the decedent executes the will promptly. For example, *Biakanja v. Irving*, 49 Cal. 2d 647, 320 P.2d 16 (1958), involved a nonattorney notary public who prepared a will that contained no witness signatures. *Biakanja*, 49 Cal. 2d at 648. The court imposed a duty in favor of the plaintiff, a potential beneficiary under the invalid will. *Biakanja*, 49 Cal. 2d at 651. Because *Biakanja* involved negligence by a nonattorney, the court necessarily omitted any discussion about whether imposition of a duty on a negligent attorney results in a burden on the legal profession.

¶26 Similarly, in *Licata v. Spector*, 26 Conn. Supp. 378, 225 A.2d 28 (1966), the court never addressed the critical question at issue here—the burden a duty of care would impose on the legal profession. *Licata* involved an attorney who drafted a will that failed to provide for the required number of witnesses, resulting in the will's invalidity. *Licata*, 26 Conn. Supp. at 380-81.

¶27 By contrast, Fink relies on case authority that declines to extend an attorney's duty to timely execute a will involving a nonclient beneficiary. The rationales in these cases are all identical—the potential conflict of interest such a duty would create for an attorney.

---

to execute a new will and attorney negligently failed to obtain one of the two required witness signatures; court held nonclient's claim actionable against an attorney who "acts negligently in drafting or supervising the execution of a will resulting in a loss to a beneficiary named therein"); *Needham v. Hamilton*, 459 A.2d 1060, 1062 (1983) (holding nonclient's claim actionable against attorney who admitted negligence in drafting of a will that omitted residuary clause—no analysis of burden on legal profession); *Heyer v. Flaig*, 70 Cal. 2d 223, 229-30, 449 P.2d 161, 74 Cal. Rptr. 225 (1969) (holding nonclient's claim actionable against attorney who negligently drafted a will that was fully signed and executed); *Lucas v. Hamm*, 56 Cal. 2d 583, 588-89, 364 P.2d 685, 15 Cal. Rptr. 821 (1961) (same); *Ward v. Arnold*, 52 Wn.2d 581, 584-85, 328 P.2d 164 (1958) (widow relied on attorney's faulty advice that a will was unnecessary and failed to have a will properly executed by her husband, resulting in part of property passing to brother rather than widow).

¶28 In *Radovich v. Locke-Paddon*, 35 Cal. App. 4th 946, 41 Cal. Rptr. 2d 573 (1995), the decedent's estate plan provided for trust income to her husband and sister. *Radovich*, 35 Cal. App. 4th at 951. The decedent met with attorney Locke-Paddon to discuss a new will under which her husband would receive all of the trust income. *Radovich*, 35 Cal. App. 4th at 952. Locke-Paddon delivered a rough draft of the new will to the decedent for review. *Radovich*, 35 Cal. App. 4th at 952. The decedent told Locke-Paddon she intended to confer with her sister before finalizing the new will. *Radovich*, 35 Cal. App. 4th at 952. The decedent died without formalizing the will. *Radovich*, 35 Cal. App. 4th at 952. The court distinguished *Biakanja*, *Lucas v. Hamm*, 56 Cal. 2d 583, 364 P.2d 685, 15 Cal. Rptr. 821 (1961) and *Heyer v. Flaig*, 70 Cal. 2d 223, 449 P.2d 161, 74 Cal. Rptr. 225 (1969), noted above, on grounds that the decedent had signed the will in those cases:

> The case before us differs from *Biakanja*, *Lucas* and *Heyer* in one significant respect: the decedent never signed the will Locke-Paddon drafted. While the crux of *Biakanja*, *Lucas* and *Heyer* was that a will the decedent *had signed* had been rendered wholly or partially ineffective, at least as to the beneficiaries, by the negligence of the person who had prepared the will, the crux of Radovich's claim is that a will potentially beneficial to him had never become effective because, assertedly due to Locke-Paddon's negligence, the decedent *had not signed* it.

*Radovich*, 35 Cal. App. 4th at 959. The court noted, "[T]his is not as strong a case for an inference of commitment to the potential beneficiary . . . ." *Radovich*, 35 Cal. App. 4th at 963. The court reasoned:

> [B]oth practical and policy reasons [exist] for requiring more evidence of commitment than is furnished by a direction to prepare a will containing specified provisions. From a practical standpoint, common experience teaches that potential testators may change their minds more than once after the first meeting. Although a potential testator may also change his or her mind *after* a will is signed, we perceive significantly stronger support for an inference of commitment in a signature

on testamentary documents than in a preliminary direction to prepare such documents for signature. From a policy standpoint, we must be sensitive to the potential for misunderstanding and the difficulties of proof inherent in the fact that disputes such as these will not arise until the decedent—the only person who can say what he or she intended—has died. Thus we must as a policy matter insist on the clearest manifestation of commitment the circumstances will permit.

*Radovich*, 35 Cal. App. 4th at 964. The court also explained that imposition of liability under the circumstances could compromise an attorney's duty of undivided loyalty to his or her client and create an incentive to exert pressure on the client to execute estate planning documents summarily. *Radovich*, 35 Cal. App. 4th at 965.[12]

¶29 *Radovich* found the rationale in *Krawczyk v. Stingle*, 208 Conn. 239, 543 A.2d 733 (1988), persuasive. There, the decedent met with his attorney to arrange for disposition of his estate. *Krawczyk*, 208 Conn. at 241. The decedent directed the attorney to prepare two trust documents intended to benefit the plaintiffs and avoid probate. *Krawczyk*, 208 Conn. at 241-42. Several delays ensued, and by the time the attorney completed the documents, the decedent was too ill to see her. *Krawczyk*, 208 Conn. at 242-43. The decedent died without signing the documents. *Krawczyk*, 208 Conn. at 243. The nonclient plaintiffs argued that when the attorney learned approximately 24 hours before the decedent died that he had suffered a heart attack and was gravely ill, she

---

[12] In *Myung Chang v. Lederman*, 172 Cal. App. 4th 67, 81, 90 Cal. Rptr. 3d 758 (2009), the court recognized the factual distinction between *Radovich* and *Osornio*:

The *Osornio* court emphasized this difference between the failed bequest in the case before it and the frustration of the potential beneficiary's expectations in *Radovich*: "In that instance, there was no plain expression of the testator's intention to benefit the plaintiff . . . . In contrast, here we have a clear expression of [the testator's] intention that Osornio be her sole beneficiary under the signed 2001 Will." (*Osornio, supra*, 124 Cal.App.4th at p. 336.) That is, to hold an attorney owed a duty of care not only to his or her testator client but also to an intended beneficiary, the testator's intent must be "*expressed* and *formalized* in [a] signed will." (*Ibid.*)

should have inquired whether the decedent was in any condition to sign the documents and whether it was possible for her to come to the hospital to have him execute them; and . . . she should either have brought hand-written documents to the hospital for the decedent's signature or alternatively have prepared a simple will that she could have presented to him for his immediate signature.

*Krawczyk*, 208 Conn. at 243.

¶30 The *Krawczyk* court acknowledged cases from other jurisdictions—including *Lucas* and *Licata*, noted above—recognizing a cause of action in favor of intended beneficiaries against attorneys who fail to draft a will in conformity with a testator's wishes or fail to supervise the proper execution of a will. *Krawczyk*, 208 Conn. at 245. The court stated, "The question before us is whether such liability should be further expanded to encompass negligent delay in completing and furnishing estate planning documents for execution by the client." *Krawczyk*, 208 Conn. at 245. It noted, "Determining when attorneys should be liable to parties with whom they are not in privity is a question of public policy." The court held that imposing liability to nonclients for negligent delay in the execution of estate planning documents would undermine a lawyer's duty of undivided loyalty to the client. *Krawczyk*, 208 Conn. at 246-47. It reasoned:

Imposition of liability would create an incentive for an attorney to exert pressure on a client to complete and execute estate planning documents summarily. Fear of liability to potential third party beneficiaries would contravene the attorney's primary responsibility to ensure that the proposed estate plan effectuates the client's wishes and that the client understands the available options and the legal and practical implications of whatever course of action is ultimately chosen.

*Krawczyk*, 208 Conn. at 246-47.

¶31 In *Sisson v. Jankowski*, 148 N.H. 503, 809 A.2d 1265 (2002), the court reached a similar conclusion. There, the disgruntled brother of a deceased testator sued the dece-

dent's lawyer for malpractice based on the following facts: The decedent hired Jankowski to prepare his will. *Sisson*, 148 N.H. at 504. According to the plaintiff, the decedent wanted to leave his entire estate to the plaintiff and disinherit another estranged brother. *Sisson*, 148 N.H. at 504. Jankowski prepared a will, mailed it to the decedent for his review, and visited the decedent in his nursing home for a formal will signing. *Sisson*, 148 N.H. at 504. The decedent wanted changes made, so Jankowski left without obtaining signatures. *Sisson*, 148 N.H. at 504-05. Jankowski returned three days later with a revised will but concluded that the decedent was not competent to sign at that time. *Sisson*, 148 N.H. at 505. Jankowski made no additional effort to determine whether the decedent regained sufficient testamentary capacity to execute his will, and the decedent died intestate. *Sisson*, 148 N.H. at 505. Rather than passing entirely to the plaintiff, the estate was divided between the plaintiff, the estranged brother, and the children of a third deceased brother. *Sisson*, 148 N.H. at 505.

¶32 The court formulated the dispositive issue:

> Whether . . . an attorney's negligent failure to arrange for his or her client's timely execution of a will and/or an attorney's failure to provide reasonable professional advice with respect to the client's testamentary options . . . gives rise to a viable common law claim against that attorney by an intended beneficiary of the unexecuted will.

*Sisson*, 148 N.H. at 503-04. It found no doubt that the decedent intended the plaintiff to inherit the entire estate. *Sisson*, 148 N.H. at 505. For purposes of determining the duty question, the court assumed negligence by Jankowski for not returning to obtain signatures. *Sisson*, 148 N.H. at 505-09. The court then addressed whether a putative heir had standing to sue the decedent's lawyer. The court held Jankowski owed the plaintiff no duty of care:

> After weighing the policy considerations the parties identify, we conclude that the potential for conflict between the inter-

ests of a prospective beneficiary and a testator militates against recognizing a duty of care. "It is the potential for conflict that is determinative, not the existence of an actual conflict." *Miller*[ *v. Mooney*, 431 Mass. 57, 725 N.E.2d 545,] 550 [(2000)]. Whereas a testator and the beneficiary of a will have a mutual interest in ensuring that an attorney drafts the will non-negligently, a prospective beneficiary may be interested in the will's prompt execution, while the testator or testatrix may be interested in having sufficient time to consider and understand his or her estate planning options. As the Massachusetts Supreme Judicial Court recognized:

> Confronting a last will and testament can produce complex psychological demands on a client that may require considerable periods of reflection. An attorney frequently prepares multiple drafts of a will before the client is reconciled to the result. The most simple distributive provisions may be the most difficult for the client to accept.

Id. at 551.

Creating a duty, even under the unfortunate circumstances of this case, could compromise the attorney's duty of undivided loyalty to the client and impose an untenable burden upon the attorney-client relationship. To avoid potential liability, attorneys might be forced to pressure their clients to execute their wills summarily, without sufficiently reflecting upon their estate planning options.

*Sisson*, 148 N.H. at 509. The court "join[ed] the majority of courts that have considered this issue and [held] that an attorney does not owe a duty of care to a prospective will beneficiary to have the will executed promptly." *Sisson*, 148 N.H. at 509.

¶33 In *Hall v. Kalfayan*, 190 Cal. App. 4th 927, 118 Cal. Rptr. 3d 629 (2010), the court addressed a prospective beneficiary's legal malpractice claim against the attorney who drafted the will but failed to execute it before the testator died. The court discussed *Biakanja*, *Lucas*, and *Heyer* and noted:

> In these cases, the testamentary instrument had been executed; the question was whether the will or trust had been

negligently prepared so as to frustrate the testator's intent. *But in cases where a potential beneficiary seeks to recover for negligence where the will or trust has not been executed, courts have refused to extend liability.*

*Hall*, 190 Cal. App. 4th at 935 (emphasis added). The court reviewed those cases and concluded:

> We agree with the *Radovich* and [*Myung*] *Chang* [*v. Lederman*, 172 Cal. App. 4th 67, 90 Cal. Rptr. 3d 758 (2009)] courts that there is a need for a clear delineation of an attorney's duty to nonclients. The essence of the claim in the case before this court is that Kalfayan failed to complete the new estate plan for Ms. Turner and have it executed on her behalf by her conservator before her death, thereby depriving Hall of his share of her estate. In the absence of an executed (and in this instance, approved) testamentary document naming Hall as a beneficiary, Hall is only a potential beneficiary. Kalfayan's duty was to the conservatorship on behalf of Ms. Turner; he did not owe Hall a duty of care with respect to the preparation of an estate plan for Ms. Turner.
>
> This conclusion is particularly appropriate in this case, where Ms. Turner herself had not expressed a desire to have a new will prepared and had only limited conversation with Kalfayan about the disposition of her estate. In addition, there is no certainty that the court would have approved the [petition for substituted judgment]. We also observe that extending Kalfayan's duty to potential beneficiaries of Ms. Turner's estate would expose him to liability to her niece, whose share of the estate would have been reduced. This is precisely the type of unreasonable burden on an attorney that militates against expanding duty to potential beneficiaries.
>
> As a matter of law, Hall cannot establish duty, a necessary element for his claim for professional negligence. The trial court properly granted summary judgment on this basis.

*Hall*, 190 Cal. App. 4th at 937-38.

¶34  Finally, in *Rydde v. Morris*, 381 S.C. 643, 675 S.E.2d 431 (2009), the South Carolina Supreme Court found *Krawczyk* and *Sisson* persuasive and declined to extend an attorney's duty to nonclient prospective beneficiaries where

the attorney negligently failed to draft and finalize a will before the testator died. In *Rydde*, the testator hired an attorney to prepare her estate plan one month before she died. *Rydde*, 381 S.C. at 645. The testator gave the attorney a completed estate planning questionnaire. *Id.* Five days later, the attorney delivered to the testator a portion of the requested estate planning documents. *Id.* The documents did not include a will and were not finalized before the testator died. *Id.* The individuals identified in the questionnaire as prospective beneficiaries sued the attorney for malpractice. *Id.* The court dismissed the complaint based on a Civil Rule 12(b)(6) motion, reasoning in part:

> Our decision today not to impose a duty on an attorney in favor of a prospective beneficiary for alleged negligent failure to draft a will follows the law in other jurisdictions. *We find persuasive the reasoning of decisions from New Hampshire, Connecticut, and Florida. We reference these three jurisdictions, for these states recognize generally that an attorney owes a duty to a non-client intended beneficiary of an executed will where it is shown that the testator's intent has been defeated or diminished by negligence on the part of the attorney, resulting in loss to the beneficiary. Having relaxed the traditional privity requirement in legal malpractice claims, these states nevertheless draw the line and refuse for compelling policy reasons to permit a malpractice claim by a non-client for negligent failure to draft a will.*

*Rydde*, 381 S.C. at 647 (emphasis added). The court concluded, "The imposition of a duty on an attorney to a prospective beneficiary of a nonexistent will would wreak havoc on the attorney's ethical duty of undivided loyalty to the client and force an impermissible wedge in the attorney-client relationship." *Rydde*, 381 S.C. at 650.

¶35 While we have assumed without deciding that Parks was an intended beneficiary, the *Trask* court stated that if the transaction was not intended to benefit the plaintiff, no

further inquiry need be made. *Trask,* 123 Wn.2d at 843. But the court went on to say:

> The multifactor balancing test also requires that we evaluate public policy before finding a duty to a third party. 1 R. Mallen & J. Smith, *Legal Malpractice* § 7.9 (3d ed. 1989). The policy considerations against finding a duty to a nonclient are the strongest where doing so would detract from the attorney's ethical obligations to the client. 1 Mallen & Smith § 7.11. This occurs where a duty to a nonclient creates a risk of divided loyalties because of a conflicting interest or of a breach of confidence. 1 Mallen & Smith § 7.11.

*Trask,* 123 Wn.2d at 844. After weighing policy considerations, we conclude that *Radovich, Krawczyk, Sisson, Hall,* and *Rydde* are dispositive of the duty question here. These jurisdictions decline to impose a duty of care where the alleged negligence concerns the failure to have a will executed promptly even if by doing so, an intended beneficiary is denied a remedy. In this case, the undisputed evidence shows that Fink brought the draft will to the hospital to discuss and review its contents with Balko. There is no record evidence that Fink knew before she presented the draft to Balko at the hospital that he intended to designate Parks as a beneficiary or to formally execute the will in the presence of witnesses and a notary public. Nor is there any dispute that Balko told Montgomery five months *after* signing the draft that Parks would be his main heir and the will needed to be changed but he wanted to think about it more before doing so. And it is undisputed that during the 15 months since he signed the draft will until his death, Balko never had it formally executed. Under these circumstances,

> [i]mposition of liability would create an incentive for an attorney to exert pressure on a client to complete and execute estate planning documents summarily. Fear of liability to potential third party beneficiaries would contravene the attorney's primary responsibility to ensure that the proposed estate plan effectuates the client's wishes and that the client understands

the available options and the legal and practical implications of whatever course of action is ultimately chosen.

*Krawczyk*, 208 Conn. at 246-47.

¶36 We also agree with the concerns expressed in *Sisson*:

Whereas a testator and the beneficiary of a will have a mutual interest in ensuring that an attorney drafts the will nonnegligently, a prospective beneficiary may be interested in the will's prompt execution, while the testator or testatrix may be interested in having sufficient time to consider and understand his or her estate planning options. . . .

. . . .

. . . . *To avoid potential liability, attorneys might be forced to pressure their clients to execute their wills summarily, without sufficiently reflecting upon their estate planning options.*

*Sisson*, 148 N.H. at 509 (emphasis added).

¶37 Washington ethics rules are clear that " '[t]he standards of the legal profession require undeviating fidelity of the lawyer to his client. No exceptions can be tolerated.' " *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 388, 715 P.2d 1133 (1986) (alteration in original) (quoting *Van Dyke v. White*, 55 Wn.2d 601, 613, 349 P.2d 430 (1960)). The same policy concerns underlying *Sisson*, *Radovich*, and *Krawczyk* apply here. Imposing a duty on Fink creates an irreconcilable conflict of interest involving a simultaneous duty owed to both Balko and Parks.

¶38 Parks argues that absent a duty, he lacks a legal remedy against Fink.[13] Imposing a duty even under these circumstances could diminish the attorney's duty of undi-

---

[13] The *Radovich* and *Sisson* courts rejected a similar "lack of remedy" argument. The *Radovich* court reasoned:

[O]bviously the notion that liability can legitimately be imposed to deter carelessness cannot be applied arbitrarily or in a vacuum. Just as it would not do to award damages to a randomly selected bystander simply to bring home a message that the defendant and others like him or her should not be careless, so it would not do to make such an award, even to a rationally selected plaintiff, if in the circumstances the objective of deterrence is outweighed by countervailing policy considerations.

vided loyalty to the client and impose an untenable burden on the attorney-client relationship. On balance, we conclude that the risk of interfering with the attorney's duty of undivided loyalty to the client exceeds the risk of harm to the prospective beneficiary. For the reasons discussed above, we join the majority of courts that have considered the issue and hold that an attorney owes no duty of care to a prospective will beneficiary to have the will executed promptly.

## CONCLUSION

¶39 For the reasons discussed above, we affirm the trial court.

Cox and DWYER, JJ., concur.

Review denied at 177 Wn.2d 1025 (2013).

---

*Radovich*, 35 Cal. App. 4th at 965. Similarly, the *Sisson* court concluded that the potential for conflict of interest between a prospective beneficiary and a testator militates against imposing a duty of care even though some plaintiffs will be left without a remedy. *Sisson*, 148 N.H. at 509 ("Creating a duty, even under the unfortunate circumstances of this case, could compromise the attorney's duty of undivided loyalty to the client and impose an untenable burden upon the attorney-client relationship.").