[No. B165402. Second Dist., Div. One. Nov. 1, 2004.]

JUANITA BORANIAN et al., Plaintiffs and Respondents, v.
LAURENCE E. CLARK, Defendant and Appellant.

COUNSEL

Mazur & Mazur, Janice R. Mazur and William E. Mazur, Jr., for Defendant and Appellant.

Law Offices of Tamila C. Jensen and Tamila C. Jensen for Plaintiffs and Respondents.

---

OPINION

**VOGEL, J.**—Although a lawyer retained to provide testamentary legal services to a testator may also have a duty to act with due care for the interests of an intended third party beneficiary, the lawyer's primary duty is owed to his client and his primary obligation is to serve and carry out the client's intentions. Where, as here, there is a question about whether the third-party beneficiary was, in fact, the decedent's *intended* beneficiary, and the beneficiary's claim is that the lawyer failed to adequately ascertain the testator's intent or capacity, the lawyer will not be held accountable to the beneficiary—because any other conclusion would place the lawyer in an untenable position of divided loyalty. We reverse the judgment before us.

### FACTS

#### A.

Marlene Farris, a widow, met Placido Chavez in 1998, and Chavez moved in with Farris not long after that. Farris told her daughter (Juanita Boranian) that she was lonely and needed a companion.

In mid-1999, Farris refinanced her house and used most of the proceeds to purchase a laundromat for $120,000. Chavez operated the business but paid nothing toward its purchase or operation (he had few assets of his own). Farris did not tell her children about the laundromat until September 1999, and then only because Boranian had noticed that Farris's monthly mortgage had increased from about $400 to $1,160, at which time Farris said she had

purchased the laundromat "as an asset for her family." Later, Farris decided to give the laundromat to Chavez.

## B.

By early 2000, Farris was terminally ill and receiving 24-hour hospice care in her home. Chavez (who later testified he was acting at Farris's direction) met with a lawyer, Laurence E. Clark, and asked him to prepare a will for Farris, and documentation of a gift from Farris to Chavez. On March 12, Chavez again met with Clark, told him Farris was "pretty ill," and gave Clark some documents, including a fictitious business name statement listing Farris and Chavez as "co-owners" of the laundromat, and an undated letter signed by Farris in which she stated she was giving Chavez the laundromat as a "gift."

Clark understood from Chavez that Farris wanted Chavez to have the laundromat, and her children to have her house and all of her remaining assets (an estate worth about $900,000 at the time of Farris's death). Chavez told Clark he had no money, and the debt incurred to purchase the laundromat should remain as a lien against Farris's home. In drafting Farris's will and other documents, Clark relied completely on information and directions from Chavez, but Clark nevertheless considered Farris his client, and Chavez merely as her agent. On March 15, Clark prepared the requested documents (a will, a "confirmation of gift," and an "assignment of lease"), and Chavez paid Clark's fee ($1,000) with Farris's money.

## C.

By the time the documents were prepared, Farris's condition was "deteriorating rapidly." She had trouble breathing, her blood pressure was dropping, her kidneys were failing, and she was taking morphine for pain. She was sometimes confused, very sleepy (she would drift off mid-sentence), and sometimes hallucinated. On the morning of March 16, she was lethargic, hallucinating, and in great pain. She was given additional morphine. Farris's nurses, who knew Chavez as Farris's "significant other," observed mutual affection between the two, and the vocational nurse (Vickie Barela) was present when, at 10:00 a.m., Chavez ushered Clark and Clark's secretary (Jane Quintana) into Farris's bedroom. Clark did not inquire about Farris's medication. Barela stepped out and the door was locked behind her.

Barela immediately called Farris's son, John Farris, who had earlier told Barela that he had a power of attorney and should be called "if anything suspicious happened." John was upset and told Barela to knock on Farris's door and demand entry. Barela complied but was told, "She's fine." Barela

overheard comments from inside the room, including, "What's your name," "She's asleep," "You're doing fine," and "Write your name, Marlene Farris."

According to Clark, he paraphrased the contents of the will for Farris (she did not read it). He told Farris that, as drafted, the laundromat would go to Chavez and everything else would go to her children. Farris said, "That's what I want." Clark's secretary then read the will to Farris verbatim, with a copy available for Farris to follow along. Clark did not tell Farris that her children would be financially responsible for the $120,000 debt incurred to purchase the laundromat.

After some time, Farris's registered nurse (Susan Yamamoto) arrived to find Barela still on the phone with John Farris. Yamamoto spoke to him, then entered Farris's room (finding the door unlocked and Chavez absent from the room), observed papers all over the bed, and a pen in Farris's hand. She told Clark and Quintana to leave, "counted to three," then went to call the police when they did not move. They left, but did not leave copies of any of the documents with Farris. Yamamoto immediately examined Farris and found her "extremely sleepy." When the police arrived, Farris knew her name but not the exact day or date. Medical notes from that morning show that Farris was sleepy, confused, and hallucinating.

## D.

Farris died three days later, on March 19. Farris's daughter (Boranian) offered a 1979 will for probate, and Chavez offered the will prepared by Clark in March 2000. A will contest ensued, but Chavez ultimately agreed to settle the matter and give up all claim to the laundromat in exchange for $5,000. The laundromat was sold in May 2001 for $75,000.

## E.

Boranian and John Farris (collectively Boranian) then sued Clark for professional negligence and breach of fiduciary duty. Clark answered, discovery ensued, and the case was tried to the court in 2002. Clark asked the court to first consider whether, as a matter of law, he owed a duty to Boranian, but the court declined to do so until after Boranian presented her evidence. Boranian then presented evidence of the facts summarized above, plus the testimony of an expert who opined that Clark's performance fell below the standard of care. Clark's motion for nonsuit, made at the close of Boranian's case, was first tentatively denied, then denied again at the conclusion of the trial.

The trial court found in favor of Boranian, determined that Clark was negligent, and that his joint representation of both Farris and Chavez constituted a conflict of interest. The court also found that Farris lacked testamentary capacity, but never addressed the issue of duty. A judgment was entered in favor of Boranian in which Clark was ordered to pay $100,299.06 in damages. Clark appeals from that judgment.

## DISCUSSION

Clark contends he did not owe a duty of care to Boranian. We agree and therefore do not reach his other claims of error.

### A.

"It is an elementary proposition that an attorney, by accepting employment to give legal advice or to render legal services, impliedly agrees to use ordinary judgment, care, skill and diligence in the performance of the tasks he undertakes [citation]. In elaborating on this duty, the cases have repeatedly held that an attorney who assumes preparation of a will incurs a duty not only to the testator client, but also to his intended beneficiaries, and lack of privity does not preclude the testamentary beneficiary from maintaining an action against the attorney based on either the contractual theory of third party beneficiary or the tort theory of negligence." (*Ventura County Humane Society v. Holloway* (1974) 40 Cal.App.3d 897, 903 [115 Cal.Rptr. 464]; *Lucas v. Hamm* (1961) 56 Cal.2d 583, 589–591 [15 Cal.Rptr. 821, 364 P.2d 685]; *Heyer v. Flaig* (1969) 70 Cal.2d 223, 226–229 [74 Cal.Rptr. 225, 449 P.2d 161]; *Moore v. Anderson Zeigler Disharoon Gallagher & Gray* (2003) 109 Cal.App.4th 1287, 1294–1295 [135 Cal.Rptr.2d 888].)

But the lawyer's liability to the "intended beneficiary" is not automatic or absolute, and there is no automatic liability where the testator's intent or capacity is placed in issue by the allegedly *intended* beneficiary. Whether liability exists in a specific case is a matter of policy and involves the balancing of various factors, including (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the lawyer's conduct and the injury suffered, (5) the moral blame attached to the lawyer's conduct, (6) the policy of preventing future harm, (7) the likelihood that imposition of liability might interfere with the attorney's ethical duties to the client, and (8) whether the imposition of liability would impose an undue burden on the profession. (*Moore v. Anderson Zeigler Disharoon Gallagher & Gray, supra,* 109 Cal.App.4th at p. 1295; *Lucas v. Hamm, supra,* 56 Cal.2d at pp. 588–589.)

## B.

In *Biakanja v. Irving* (1958) 49 Cal.2d 647 [320 P.2d 16], the sole beneficiary under a will, who lost her bequest because the defendant, a notary public, failed to have the will properly attested, had a claim against the decedent's lawyer because the " 'end and aim' " of the will—to provide for the named beneficiary—was undisputed. (*Id.* at pp. 650–651.) In *Lucas v. Hamm, supra,* 56 Cal.2d 583, the beneficiaries under a will who lost their bequests because the lawyer failed to avoid the operation of the rule against perpetuities, had a claim against the testator's lawyer because there was no question about the testator's intent or capacity. In *Heyer v. Flaig, supra,* 70 Cal.2d 223, where the lawyer's failure to advise the testatrix of the legal consequences of her intended marriage caused the testatrix's daughters to lose their intended legacies, and there was no doubt whatsoever about the testatrix's capacity or intent, the daughters could pursue a claim against their mother's lawyer. In each of these cases, the court was satisfied that the lawyer should be responsible to a third person because the transaction was plainly intended to benefit that person, the harm to that person was foreseeable, there was a reasonable degree of certainty that the third person suffered injury as a result of the lawyer's conduct, and the policy of preventing future harm outweighed the burden placed on the lawyer by the imposition of this additional liability. (See *Lucas v. Hamm, supra,* 56 Cal.2d at p. 588.)

## C.

But liability to a third party will not be imposed where there is a substantial question about whether the third party was in fact the decedent's *intended* beneficiary, or where it appears that a rule imposing liability might interfere with the attorney's ethical duties to his client or impose an undue burden on the profession.

In *Radovich v. Locke-Paddon* (1995) 35 Cal.App.4th 946 [41 Cal.Rptr.2d 573], where a lawyer prepared a new will for a client naming her husband as a beneficiary but the client died without executing the will, the husband could not sue the lawyer for failing to carry out the decedent's wishes in a reasonably prompt and diligent fashion—because the "imposition of liability in a case such as this could improperly compromise an attorney's primary duty of undivided loyalty to his or her client, the decedent." (*Id.* at p. 965.) In *Moore v. Anderson Zeigler Disharoon Gallagher & Gray, supra,* 109 Cal.App.4th at page 1302, the court held that a lawyer does not have a duty to the beneficiaries under a will to evaluate and ascertain the testamentary capacity of a client seeking to amend his will or to make a new will. In *Ventura County Humane Society v. Holloway, supra,* 40 Cal.App.3d 897, a lawyer who drafted a will with a substantial bequest to a nonexistent animal

rights organization (Society for the Prevention of Cruelty to Animals (Local or National)) owed no duty to the Ventura County Humane Society to establish the true intention of the testator. (See also *Hiemstra v. Huston* (1970) 12 Cal.App.3d 1043, 1046 [91 Cal.Rptr. 269].)

### D.

■ In resolving the issue now before us, we emphasize the basic principle that, while out of an agreement to provide legal services to the testator, a duty also arises to act with due care with regard to the interests of the *intended* beneficiary, *the scope of duty owed to the beneficiary is determined by reference to the attorney-client relationship*. The primary duty is owed to the testator-client, and the attorney's paramount obligation is to serve and carry out the intention of the testator. Where, as here, the extension of that duty to a third party could improperly compromise the lawyer's primary duty of undivided loyalty by creating an incentive for him to exert pressure on his client to complete her estate planning documents summarily, or by making him the arbiter of a dying client's true intent, the courts simply will not impose that insurmountable burden on the lawyer. (*Moore v. Anderson Zeigler Disharoon Gallagher & Gray, supra,* 109 Cal.App.4th at p. 1298; *Radovich v. Locke-Paddon, supra,* 35 Cal.App.4th at p. 965; *Ventura County Humane Society v. Holloway, supra,* 40 Cal.App.3d at pp. 904–905.)

■ Under the rule announced in *Moore v. Anderson Zeigler Disharoon Gallagher & Gray, supra,* 109 Cal.App.4th at page 1298, Clark's sole duty was to Farris, and he did not owe a duty to Farris's beneficiaries to evaluate or ascertain his client's capacity to make a new will. As *Moore* explains, a lawyer "who is persuaded of the client's testamentary capacity by his . . . own observations and experience, and who drafts the will accordingly, fulfills that duty of loyalty to the testator[, and he] should not be required to consider the effect of the new will on beneficiaries under a former will or beneficiaries of the new will." (*Id.* at p. 1299 [135 Cal.Rptr.2d 888], italics omitted.)[1] We add to this our own

---

[1] We note for the sake of completeness that, at trial, Clark testified that, upon entering Farris's bedroom on the morning of March 16, he observed Farris talk with Chavez and Quintana, asked Farris her name, address, phone number, age, and other miscellaneous questions, conversed with her about the terms of the will, and concluded that she was certainly "with it that day." Quintana testified that she felt Farris was "competent and knew what she was doing" that day, that Farris knew why Quintana and Clark were there, answered questions correctly, and seemed to know her property, her children, and her marital status. Farris said she wanted Chavez to receive the business and asked, "Are you sure this is going to do it?" Quintana said Farris "was weak. But she acted normal." A defense medical expert, Matthew Boone, M.D., testified based largely on his review of medical records and discovery that, "to a reasonable degree of medical certainty, [Farris] was able to execute the testamentary event of

observation that a lawyer who is persuaded of his client's intent to dispose of her property in a certain manner, and who drafts the will accordingly, fulfills his duty of loyalty to his client and is not required to urge the testator to consider an alternative plan in order to forestall a claim by someone thereby excluded from the will (or included in the will but deprived of a specific asset bequeathed to someone else).

As *Moore* also explains, a rule that extended a lawyer's duty to beneficiaries in this context would place "an intolerable burden" on the lawyer. "Not only would the attorney be subject to potentially conflicting duties to the client and to potential beneficiaries, but counsel also could be subject to conflicting duties to different sets of beneficiaries," including those disinherited if the lawyer prepares a will or potential beneficiaries if the attorney refuses to prepare a new will in accordance with the testator's wishes. (*Moore v. Anderson Zeigler Disharoon Gallagher & Gray, supra,* 109 Cal.App.4th at p. 1299.)

There is also the fact that "[a]scertaining testamentary capacity is often difficult and the potential for liability to beneficiaries who might deem any investigation inadequate would unjustifiably deny many persons the opportunity to make or amend their wills. [¶] Factors which might suggest lack of testamentary capacity to some attorneys do not necessarily denote a lack of capacity. '. . . [O]ld age, feebleness, forgetfulness, filthy personal habits, personal eccentricities, failure to recognize old friends or relatives, physical disability, absent-mindedness and mental confusion do not furnish grounds for holding that a testator lacked testamentary capacity.' . . . Even hallucinations and delusions do not demonstrate lack of capacity if not related to the testamentary act. . . . Any doubts as to capacity might be resolved by counsel by refusing to draft the will as desired by the testator, turning the presumption of testamentary capacity on its head and requiring the testator represented by a cautious attorney to prove his competency." (*Moore v. Anderson Zeigler Disharoon Gallagher & Gray, supra,* 109 Cal.App.4th at pp. 1299–1300.)

Finally, *Moore* notes that beneficiaries of "a will executed by an incompetent testator have a remedy in the probate court. They may contest the probate

signing the will" on March 16. The doctor explained that although Farris was terminally ill and suffering intermittent periods of disorientation, visual hallucinations, and transient confusion as a result of her medication, there was no evidence that she had delusional thought processes. To the end, she attempted to maintain some independence from her children and was attempting to conduct business she did not want them to know about. The trial court rejected this evidence in favor of the testimony given by Farris's nurses in finding that Farris did not have testamentary capacity when she executed the March 16 will. On the issue of intent, the evidence established that Farris had for some period of time intended to make a gift of the laundromat to Chavez and that Farris knew Chavez was unable to repay the debt incurred for the purchase of the laundromat.

and challenge the will on the ground that the testator lacked testamentary capacity at the time of executing the will." (*Moore v. Anderson Zeigler Disharoon Gallagher & Gray, supra,* 109 Cal.App.4th at p. 1300.) That is precisely what happened in our case—Boranian challenged the March 2000 will in the probate court, and the issue of testamentary capacity would have been resolved there had she not settled the matter with Chavez.

For these reasons, Clark owed no duty to Boranian, and he was entitled to a judgment in his favor.[2]

## DISPOSITION

The judgment is reversed, and the cause is remanded to the trial court with directions to enter a new judgment in favor of Clark. Clark is entitled to his costs of appeal.

Spencer, P. J., and Mallano, J., concurred.

---

[2] The trial court also found that Clark should have included in Farris's will a provision for the allocation of the debt incurred to purchase the laundromat. This, of course, goes to the issue of Farris's intent, which the evidence shows was to give the laundromat to Chavez. Since the will signed by Farris gave Chavez the laundromat free and clear of the debt incurred when it was purchased, and since the burden was on Boranian to show a different intent (*Ventura County Humane Society v. Holloway, supra,* 40 Cal.App.3d at pp. 905–906) and since Boranian failed to meet that evidentiary burden, a proper construction of the will would leave the debt where it is—on the estate. (*Ventura County Humane Society v. Holloway, supra,* 40 Cal.App.3d at p. 903; *Hiemstra v. Huston, supra,* 12 Cal.App.3d 1043.)