Filed 3/20/23 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| BRUCE GORDON et al., | B313903 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC715251) |
| v. | |
| ERVIN COHEN & JESSUP LLP et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants and Respondents. | NO CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on February 23, 2023, be modified as follows:

1. On page 20, the end of the second full paragraph, delete the sentence that begins with "To the contrary," and insert the following in its place:

To the contrary, it is undisputed that Chudd informed Claire during a telephone conversation that the LLC operating agreements did not restrict Kenneth's children from inheriting Kenneth's interests in the LLCs, that Claire never told Chudd of a desire to prevent Kenneth from passing his interests to his children, and that Claire—in the 10-plus years between executing the LLC operating agreements and her death—never expressed any discontent with the terms of the LLC operating agreements.

2. On page 24, the first full paragraph, replace the word "four" with the word "five" so that the full sentence reads:

Plaintiffs resist our analysis with what can be grouped into five further arguments.

3. On page 26, immediately following the paragraph that ends with "plaintiffs' unlimited syllogism" in line 3, insert a new paragraph that reads as follows:

Third, plaintiffs assert in their petition for rehearing that our application of the settled rule that a lawyer owes a nonclient third party no duty unless the client's intent to benefit that third party is clear, certain and undisputed erects a "bright-line rule" that "immunizes" lawyers from malpractice as long as the client signs whatever document an

"unscrupulous and negligent" lawyer puts in front of her. Plaintiffs grossly mischaracterize our holding. We hold, as the courts before us uniformly have, that a nonclient third party can maintain a malpractice action only if there is clear, certain and undisputed evidence of the client's intent to benefit the third party, or to benefit the third party in the way he claims; here, plaintiffs failed to present sufficiently clear evidence that Claire intended to prohibit Kenneth's children from inheriting any interests in the LLCs.

4. On page 26, modify the sentence that begins with "Third, plaintiffs express" in line 4 to read as follows:

Fourth, plaintiffs express their disagreement with several aspects of the trial court's reasoning in granting summary judgment—namely, that the trial court erred in (1) focusing on the intent "element," and (2) insisting that Claire's intent be derived from the LLC operating agreements, because that insistence somehow wrongly conflates the element of duty with the element of breach of duty.

5. On page 26, line 15, after the sentence that ends with "are also incorrect," insert the following:

Plaintiffs' argument that only the intent "element" was at issue rests on a misapprehension of the law: The only "element" at issue is duty; intent is but one

of many factors bearing on whether to recognize such a duty.

6. On page 26, line 15, in the sentence that begins with "The trial court's insistence," replace the first word of the sentence, "The," with "And the" so that the full sentence reads:

   And the trial court's insistence upon clear, certain and undisputed evidence of Claire's intent properly focuses on the very question of duty; the court was not examining the breach of duty element.

7. Delete the sentence that begins at the bottom of page 26 with "To the extent plaintiffs" and ends at the top of page 27 with "recognize such a duty," and insert the following in its place:

   In their petition for rehearing, plaintiffs expand on their argument that the court erred in looking at the LLC operating agreements in a vacuum because, according to plaintiffs, Claire's intent to disinherit Kenneth's children would have been expressed in those operating agreements but for the lawyers' malpractice in drafting them contrary to her intent expressed in the trust and in not advising Claire about the complexities of the LLC transaction (specifically, how the transaction was consummated differently than first explained to Claire). Plaintiffs' argument fails for three reasons. It fails because

4

plaintiffs are conflating duty and breach by focusing on whether the lawyers satisfied the standard of care in their rendering of legal services to Claire. Plaintiffs' argument fails because it presumes the conclusion we have rejected—that is, that Claire had the same intent to disinherit Kenneth's children with regard to every disposition of assets during her lifetime. And plaintiffs' argument fails because any inference that Claire misunderstood the LLC transaction does not amount to evidence of a clear, certain and undisputed intent by Claire to prevent the LLC interests from being passed on to Kenneth's children.

*     *     *

There is no change in the judgment.

Appellants' petition for rehearing is denied.

_____

LUI, P. J.        ASHMANN-GERST, J.        HOFFSTADT, J.

Filed 2/23/23 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| BRUCE GORDON et al., | B313903 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC715251) |
| v. | |
| ERVIN COHEN & JESSUP LLP et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Patricia Nieto, Judge. Affirmed.

Complex Appellate Litigation Group, Rex S. Heinke, Jessica Weisel; Joshua R. Furman Law and Joshua R. Furman for Plaintiffs and Appellants.

Halpern May Ybarra Gelberg, Joseph J. Ybarra, Kevin H. Scott, Joel Mallord; Ervin Cohen & Jessup and Allan B. Cooper for Defendants and Respondents.

\*　　\*　　\*

A lawyer retained to draft a client's will or trust has a duty to "use such skill, prudence, and diligence as members of [the legal] profession commonly possess and exercise." (*Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194, 1199 (*Coscia*).) If the lawyer fails to do so, the client can sue for legal malpractice. What is more, the lawyer's duty—and the concomitant right to sue for legal malpractice—can extend to nonclients, but only if the client's intent to benefit the nonclient is "clear," "certain" and "undisputed." (*Heyer v. Flaig* (1969) 70 Cal.2d 223, 229 (*Heyer*), disapproved on other grounds by *Laird v. Blacker* (1992) 2 Cal.4th 606; *Paul v. Patton* (2015) 235 Cal.App.4th 1088, 1097, 1098 (*Paul*).)

But *when* is the client's intent clear, certain and undisputed enough that the lawyer then owes the nonclient a duty? Here, the client retained an attorney to amend her testamentary trust in a way that disinherited the three children of one of her sons upon her death. Soon thereafter, the client retained the attorney to place three parcels of real estate held by the trust into three limited liability companies (LLCs) and then gifted equal membership interests in the LLCs to each of her three sons. Notably, the LLC operating agreements did not prohibit the sons from gifting *their* LLC membership interests to their children, thereby making it possible for membership interests in the LLC to be passed to the grandchildren whom the client had disinherited from her testamentary trust. Thus, this

2

case presents the question:  Does a client's intent to disinherit someone in a testamentary trust by itself constitute clear, certain and undisputed intent to disinherit them in every subsequent transaction the client makes with the property contained in the trust?  We conclude that the answer is no, that the attorney in this case accordingly owed no duty to guard against that result, and that the trial court properly granted summary judgment to the attorney and his law firm sued in this case by certain beneficiaries of the testamentary trust.  We accordingly affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.     Facts

#### A.     *The Gordon family*

Arnold and Claire Gordon married, and had three children in the 1940s—Jeffrey (born 1941), Bruce (born 1945), and Kenneth (born 1948).[1]  Bruce married, and had two sons—Brian and Steven.  Kenneth married, and had three children—Dara, Michael, and David.  Jeffrey married, but had no children.

#### B.     *The 1983 Gordon Family Trust*

In 1983, Arnold and Claire created The Gordon Family Trust, dated June 28, 1983 (the "family trust" or the "trust").  The trust was funded, in part, with several parcels of commercial real estate as well as stocks and other securities.

As pertinent here, the trust provided that it would be broken into three subtrusts—called Trust A, Trust B, and Trust C—upon the death of either Arnold or Claire.  Trust A would hold all of the surviving spouse's separate property as well as one-half of the couple's community property.  Because the surviving

---

[1]     Because these family members all share the same last name, we use first names for clarity's sake.  We mean no disrespect.

3

spouse would be individually entitled to the property in Trust A, the surviving spouse would have the power to use and devise the income and principal of Trust A however they wished. Trust B and Trust C would hold all of the deceased spouse's separate property as well as the other half of the couple's community property. More specifically, Trust B would be a "bypass trust" containing stocks and other securities, while Trust C would be a qualified terminable interest property trust (or QTIP trust) designed to qualify for the unlimited federal estate tax marital deduction and contain various parcels of real property. Because the surviving spouse would not be personally entitled to the property in Trust B and Trust C, the surviving spouse's power to access the property in Trust B and Trust C would be more limited: The surviving spouse could draw upon the income generated from the property in those two subtrusts, but could invade or alienate the principal of those subtrusts only if needed for their "care, support and maintenance." Upon the surviving spouse's death, any property in Trust A not devised by the surviving spouse during her lifetime and all properties in Trust B and Trust C would be divided into shares among Arnold and Claire's still-living sons (or, to a lesser degree, a deceased son's spouse) and the grandchildren.

### C. *Further events*

#### 1. *Arnold's death*

Arnold died on March 25, 1989.

#### 2. *Claire's relationship with her family*

Among her three sons, Claire was "closest" with Kenneth. However, Claire had "strained relationship[s]" with Kenneth's wife and his three children.

4

Between 1997 and 2006, Claire went back and forth disinheriting one or more of Kenneth's children from the trust, and toward that end executed a number of amendments to the trust. In January 2006, Claire executed the twelfth and final amendment to the trust that disinherited all three of Kenneth's children under the trust.

These amendments were all drafted by attorney Reeve Chudd (Chudd), who was a partner at Ervin Cohen & Jessup LLP (the law firm).

Because Claire wanted to maintain her close relationship with Kenneth, she did not tell him about her disinheritance of his children until 2014 or 2015, and did not tell her son Bruce about it until 2016.

### 3. *Creation of the LLCs*

Soon after Claire executed the final amendment to the trust in January 2006, Claire's accountant told Chudd that Claire was now open to allowing her three sons to receive current income from three of the commercial real estate properties held in Trust C, and that doing so would reduce the estate taxes due upon her death because any subsequent appreciation in the value of those properties would—by virtue of this new arrangement—be "out of [the] Estate."

With Chudd's assistance, Claire took the following steps. First, Claire in December 2006 created three LLCs. Into each, she transferred one of the income-producing commercial properties in Trust C; consistent with that subtrust's limitations, Claire named Trust C as the owner of each LLC. Second, Claire had Trust C transfer ownership of each LLC to Trust A; in exchange, Trust A executed promissory notes to Trust C for the value of the properties. Third, and because the LLCs' ownership

5

interests were in Trust A over which Claire had more control, Claire in April 2007 assigned a 30 percent interest in each LLC to each of her three sons and retained a 10 percent interest in each LLC for herself.

As pertinent here, the operating agreement for each LLC drafted by Chudd provides that a member of the LLC can transfer his "Economic Interest" to anyone, but can only transfer his "Membership Interest" (which includes the right to vote as well as the "Economic Interest") (1) only "with[] the consent of all of the [other] Members" or (2) without that unanimous consent, but only if the transfer is to any of the "descendants of the marriage of [Claire and Arnold]" (either directly or through a trust).[2] Thus, nothing in the LLCs' operating agreements

_____

2    In full, sections 6.1 and 6.2 of the operating agreements (which were identical for each LLC) read as follows:

> "**6.1 Transfer and Assignment of Interests.** No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate (collectively, 'transfer') all or any part of his or her Membership Interest without the consent of all of the Members, which consent may be withheld unreasonably. The term 'Membership Interest' means Economic Interest plus all other rights of a Member under the Act or this Agreement, including, but not limited to, the right to vote or participate in the management of the Company and any right to information concerning the business and affairs of the Company. The term 'Economic Interest' means only the right to receive distributions of the Company's assets and allocations of income, gain, loss, deduction, credit and similar items from the Company pursuant to this Agreement and the Act. Notwithstanding the foregoing, without the consent of the other Members, a Member may

prevented Kenneth (or, for that matter, Jeffrey or Bruce) from transferring their membership interests to Kenneth's children. Although Claire never told Chudd that "her intention" "about inheritance" "had changed" in the time between her execution of the final amendment to the trust and her creation of the LLCs, Claire also never told Chudd that she wished to prohibit Kenneth's children from obtaining membership interests in the LLCs. In the more than 10 years between the execution of these documents and Claire's death, Claire never told anyone that the terms of the operating agreements were inconsistent with her intent.

assign his or her Membership Interest to (a) one or several of the descendants of the marriage of CLAIRE GORDON and the late ARNOLD G. GORDON, or (b) a trust for which such Member serves as one of the Trustees or as sole Trustee so long as the beneficiary or beneficiaries of any such trust who shall, upon the death [of] the original Member, inherit such original Member's interest transferred to said trust, shall be restricted to the descendants of the marriage of CLAIRE GORDON and the late ARNOLD G. GORDON."

"**6.2** **No Effect to Transfers in Violation of Agreement.** Any transfer in violation of this Article VI shall be null and void at the election of any non-transferring Member, that such Member may elect in his, her or its sole and absolute discretion. Any transferee other than a Transferee permitted by Section 6.1 ('the Assignee') shall be entitled to receive only the rights of an Economic Interest in the Company, and shall not have any other rights of a Membership Interest or be a Member, unless all of the non-transferring Members agree to admit the Assignee as a Member."

7

4. *Subsequent, unrestricted gifts to Claire's progeny*

In 2012, Claire made a gift of $2 million placed in a trust to her sons Kenneth and Jeffrey—with $1 million allocated to each. Those trust funds were to be distributed outright, and had no restrictions on how Kenneth or Jeffrey could use them.

Claire also took out a life insurance policy, paid the premiums out of her own funds, and designated that the proceeds would be split between her sons (90 percent) and her grandchildren (10 percent), without any prohibition on Kenneth's children receiving their share of the proceeds.

5. *Claire's death*

Claire died on March 9, 2017, at the age of 100. By this time, the value of the Gordon family assets exceeded $40 million.

## II. Procedural Background

### A. *The pleadings*

Bruce and his sons Steven and Brian (collectively, plaintiffs) sued Chudd and the law firm (collectively, the lawyers) for legal malpractice on the theory that the lawyers in drafting the LLC operating agreements did not adhere to Claire's intent because they did not prohibit Kenneth's three children from inheriting any interests in the LLCs.[3] Had the operating agreements done so, plaintiffs alleged, Kenneth's interests in the LLCs would have passed to Jeffrey and Bruce upon Kenneth's death, such that Bruce would have a greater membership

---

[3] Plaintiffs also sued for breach of fiduciary duty, but the trial court granted the lawyers' motion for judgment on the pleadings as to that claim and plaintiffs did not avail themselves of the leave to amend granted by the trial court. The claim is therefore dead.

8

interest in the LLCs and Bruce's sons might inherit those shares if Bruce elected to devise his interests to them.

**B.** *Motion for summary judgment*

The lawyers moved for summary judgment on three grounds—namely, (1) they owed plaintiffs no duty of care, (2) plaintiffs' claim was time barred, and (3) Steven and Brian had too contingent of an interest to have standing to sue. After full briefing and a hearing, the trial court granted summary judgment. Specifically, the court ruled that plaintiffs had presented "no evidence of Claire's" intent to disinherit Kenneth's children from obtaining membership interests in the LLCs, such that the lawyers owed plaintiffs no duty to effectuate that intent; the court rejected plaintiffs' argument that Claire's intent to disinherit Kenneth's children in the "separate testamentary" trust translated to an intent to preclude their ownership of LLC interests.

**C.** *Appeal*

After judgment was entered, plaintiffs filed this timely appeal.

## DISCUSSION

Plaintiffs argue that there is a triable issue of material fact as to whether the lawyers owed them a duty to draft the LLC operating agreements in a way that precluded Kenneth's children from obtaining any interest in the LLCs; as a result, plaintiffs urge, the trial court erred in granting summary judgment for the lawyers. Summary judgment is appropriate when the moving party shows that "[it] is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A party is entitled to judgment as a matter of law when, among other things, the nonmoving party (here, plaintiffs) cannot establish "[o]ne or more

elements of [their] cause of action" (*id.*, subd. (o)(1); see *id.*, subd. (p)(2)). A """key element"" of plaintiffs' sole cause of action for malpractice is """the establishment of a duty by the [lawyer] to the claimant."" (*Moore v. Anderson Zeigler Disharoon Gallagher & Gray* (2003) 109 Cal.App.4th 1287, 1294 (*Moore*); accord, *Bucquet v. Livingston* (1976) 57 Cal.App.3d 914, 921 (*Bucquet*) [duty is the "all important element"].) Absent a duty, plaintiffs cannot establish an element of their malpractice cause of action and defendants are entitled to summary judgment. Whether a duty exists is a question of law that we independently assess. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 57.) We also independently determine whether a trial court's grant of summary judgment was appropriate. (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 273.)

I. **The Law of Malpractice**

A. ***A lawyer's duties, generally***

A lawyer has a "duty . . . to use such skill, prudence, and diligence as members of [the legal] profession commonly possess and exercise" when representing a client. (*Coscia*, *supra*, 25 Cal.4th at p. 1199.) A client may accordingly sue the lawyer for legal malpractice if the lawyer breaches that duty, that breach proximately injures the client, and the client suffers actual loss or damage. (*Ibid.*; *Budd v. Nixen* (1971) 6 Cal.3d 195, 200.)

Although the lawyer's duty typically runs only to the client because that duty arises from the privity of contract that forms the lawyer-client relationship (*Borissoff v. Taylor & Faust* (2004) 33 Cal.4th 523, 529; *Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.* (2004) 131 Cal.App.4th 802, 826), a lawyer can sometimes owe a duty to third parties who are the *intended beneficiaries* of the lawyer's legal work for the client, such as

10

when the lawyer is retained by the client to draft a will, a testamentary trust, or an inter vivos trust or gift. (*Heyer, supra,* 70 Cal.2d at p. 228; *Lucas v. Hamm* (1961) 56 Cal.2d 583, 590-591 (*Lucas*); *Bucquet, supra,* 57 Cal.App.3d at pp. 920-921; *Borissoff,* at p. 530.)

The fact that a lawyer creates a will, trust, or gift for the client that benefits a third party does "not automatic[ally]" give rise to a duty running from the lawyer to the third party that is actionable in a malpractice claim. (*Bucquet, supra,* 57 Cal.App.3d at p. 921; *Ventura County Humane Society v. Holloway* (1974) 40 Cal.App.3d 897, 903 (*Ventura County Humane Society*); *Boranian v. Clark* (2004) 123 Cal.App.4th 1012, 1017 (*Boranian*); *Moore, supra,* 109 Cal.App.4th at p. 1295.) Because malpractice is a common law tort, and because "duty" in the context of such torts reflects a conclusion made by the courts—based on considerations of public policy—that one person should be liable to another (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734; *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 221; *Radovich v. Locke-Paddon* (1995) 35 Cal.App.4th 946, 954-955 (*Radovich*)), the question of *whether* a lawyer has a duty to a nonclient third party is similarly based on an amalgam of competing public policy considerations.

Fortunately, our Supreme Court has already articulated eight factors bearing on whether a lawyer should owe a duty to a nonclient, and those factors fall into three groups. The first group of factors looks to "the extent to which the transaction [between the lawyer and the client] was intended to affect the [nonclient] plaintiff" (the first factor). (*Lucas, supra,* 56 Cal.2d at p. 588.) The clearer it is that the client intended to affect (that is, to benefit) the nonclient plaintiff, the more "foreseeabl[e]" the

11

harm due to any malpractice is to the nonclient plaintiff (the second factor), the greater the "degree of certainty that the [nonclient plaintiff] suffered injury" (the third factor), the greater the "closeness of the connection between [the lawyer's] conduct and the [nonclient] plaintiff's injury" (the fourth factor), and the more that recognizing a duty furthers "the policy of preventing future harm" (the sixth factor).[4]  (*Ibid.*; see also *Ventura County Humane Society*, *supra*, 40 Cal.App.3d at pp. 906-907 [noting how the second through fourth as well as sixth factors largely turn on the first factor]; *Radovich*, *supra*, 35 Cal.App.4th at p. 964 [same]; *Paul*, *supra*, 235 Cal.App.4th at p. 1098 [same].)  As vividly illustrated by the number of factors related to the client's intent to benefit the nonclient plaintiff, the clarity of the client's intent is accordingly "central to the duty analysis."  (*Paul*, at p. 1097.)  The second group of factors examines the "likelihood that impos[ing] liability [on the lawyer to the nonclient plaintiff] might interfere with the [lawyer's] ethical duties to the client" (the seventh factor).  (*Boranian*, *supra*, 123 Cal.App.4th at p. 1017; accord, *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 344 (*Goodman*).)  A lawyer's "paramount" and "primary" duty is to the client and, more immediately, to carrying out the client's intent (*Ventura County Human Society*, at pp. 904-905; *Boranian*, at pp. 1014, 1019), so courts are less willing to impose a duty running from the client to a nonclient plaintiff if recognizing that

_____

**4**      Another factor courts consider in determining whether a duty exists is the "moral blame attached to the [lawyer's] conduct" (the fifth factor).  (*Biakanja v. Irving* (1958) 49 Cal.2d 647, 650.)  However, this factor is "rarely appl[ied] as part of the[]" analysis of duty when it comes to claims of legal malpractice.  (*Osornio v. Weingarten* (2004) 124 Cal.App.4th 304, 321, fn. 15 (*Osornio*).)

additional duty might interfere with the lawyer's chief duty to the client (*Boranian*, at p. 1018; *Moore*, *supra*, 109 Cal.App.4th at p. 1299). The third group of factors assesses whether the recognition of a duty running to the nonclient plaintiff—and the resultant "recognition of liability" against the lawyer—"would impose an undue burden on the profession" (the eighth factor) (*Lucas*, at p. 589), either by (a) making the lawyer "subject to conflicting duties to different sets of [nonclient] beneficiaries" (*Moore*, at p. 1299; *Boranian*, at p. 1020), or (b) saddling the lawyer with open-ended liability that could act as a disincentive for lawyers to practice in that area of law and hence dry up access to the legal services in that area (*Ventura County Humane Society*, at p. 905).

### B.    *A lawyer's duty to a nonclient, specifically*

After balancing the factors articulated above, the California courts have uniformly settled upon the following rule: A lawyer has a duty to a nonclient third party only if the client's intent to benefit that third party (in the way the third party asserts in their malpractice claim) is "clear," "certain" and "undisputed." (*Heyer*, *supra*, 70 Cal.2d at p. 229 ["certain"]; *Paul*, *supra*, 235 Cal.App.4th at pp. 1097, 1098 ["clear"; "undisputed"]; *Radovich*, *supra*, 35 Cal.App.4th at pp. 958-959 ["certain"]; *Moore*, *supra*, 109 Cal.App.4th at p. 1299 ["certain"].) In other words, courts will recognize a duty to a nonclient plaintiff—and thereby allow that plaintiff to sue the lawyer for legal malpractice—only when the plaintiff, as a threshold matter, establishes that the client, in a clear, certain and undisputed manner, told the lawyer, "Do *X*" (where *X* benefits the plaintiff).

13

There are a few reasons why the courts have consistently insisted upon this heightened showing when it comes to the clarity of the client's intent.

First, it is only when the client's intent to benefit the nonclient third party is abundantly clear that the courts can be sure that the third party's malpractice claim is enforcing the *client*'s wishes, which is the "'main purpose'" of a malpractice lawsuit—no matter who is prosecuting it. (*Paul*, *supra*, 235 Cal.App.4th at p. 1098; accord, *Garcia v. Borelli* (1982) 129 Cal.App.3d 24, 32 (*Garcia*); *Ventura County Humane Society*, *supra*, 40 Cal.App.3d at p. 903.)

Second, the pertinent factors support the recognition of a duty running to the nonclient plaintiff only when the client's intent to benefit that nonclient is clear, certain and undisputed. When the client's intent meets this heightened standard, there is no doubt that the transaction between the lawyer and the client was intended to affect the nonclient plaintiff, which means that the injury to the plaintiff from the lawyer's negligence in carrying out that intent is foreseeable, the injury to the plaintiff is more certain, the connection between the lawyer's conduct and the plaintiff's injury is closer, and it is more likely that allowing the malpractice claim to move forward would prevent future harm. When the client's intent meets this heightened standard, it is more likely that the nonclient plaintiff's interests in prosecuting a malpractice claim perfectly represent the client's interests, thereby reducing the likelihood that a duty running from the lawyer to the nonclient plaintiff would put the lawyer in an ethical quandary. (*Paul*, *supra*, 235 Cal.App.4th at p. 1100 [if "there is no dispute regarding the decedent's intent, the imposition of liability will not compromise the [lawyer's] duty of

14

undivided loyalty to the testator"].) And when the client's intent meets this heightened standard, there is less danger that the lawyer will be subject to conflicting duties to different nonclient beneficiaries because only those beneficiaries as to whom the client's intent is crystal clear may sue for malpractice. This heightened standard also reduces the danger of open-ended liability for lawyers because it can be decided as a matter of law, either on demurrer or summary judgment (because a nonclient plaintiff would be unable to raise a factual dispute about the client's intent absent evidence that the client had a clear, certain and undisputed intent to benefit the plaintiff). (*Chang v. Lederman* (2009) 172 Cal.App.4th 67, 83 (*Chang*) [so noting].)

California courts have routinely insisted that nonclient plaintiffs bringing malpractice claims adduce clear, certain and undisputed evidence of the client's intent to benefit them in the way they are seeking to vindicate. In *Heyer*, *supra*, 70 Cal.2d 223, the client tasked her lawyer with drafting a will that left her estate only to the client's two daughters and told the lawyer she was about to get married. *Heyer* held that the daughters could sue the lawyer for malpractice when the lawyer failed to account for how the client's marriage would disrupt her clearly articulated intent to pass her estate to *only* her daughters. (*Id.* at pp. 225-229.) In *Bucquet*, *supra*, 57 Cal.App.3d 914, the client tasked the lawyer with drafting an inter vivos trust in a manner that would reduce estate taxes. *Bucquet* held that the trust's beneficiaries could sue when the lawyer's use of a general power of appointment (rather than a more tax-savvy mechanism) disrupted the client's clearly articulated intent to reduce those taxes. (*Id.* at pp. 918-919.) In *Garcia*, *supra*, 129 Cal.App.3d 24, the client tasked the lawyer with ensuring that some of the

15

property that was delineated in his will remained his separate property and would be passed to his son. *Garcia* held that the son could sue the lawyer when the lawyer's careless drafting disrupted the client's clearly articulated intent to ensure that the property was designated as separate property. (*Id.* at pp. 29, 32.) In *Osornio, supra*, 124 Cal.App.4th 304, the client tasked her lawyer with drafting a will that would leave all of her property to the woman who served as the client's care custodian. *Osornio* held that the care custodian could sue the lawyer when the lawyer's failure to obtain a "certificate of independent review" necessary to permit an otherwise disqualified care custodian to inherit disrupted the client's clearly articulated intent to benefit the care custodian. (*Id.* at pp. 329, 334.) And in *Paul, supra*, 235 Cal.App.4th 1088, the client tasked his lawyer with drafting an amendment to his testamentary trust that gave several items of property to his children and *not* his wife. *Paul* held that the children could sue the lawyer when the lawyer's amendment allowing the wife also to inherit that property disrupted the client's undisputed intent that his children (and children alone) inherit. (*Id.* at pp. 1091, 1093, 1097.)

### C. *The limits of a lawyer's duty to a nonclient*

The carefully delineated rule that a nonclient plaintiff may sue a lawyer for malpractice only when the client's intent to "Do *X*" (that is, to do something to benefit that plaintiff) is clear, certain and undisputed means that there are several scenarios in which the lawyer owes *no* duty to that nonclient plaintiff. Two of those scenarios are relevant here.

First and most obviously, a lawyer owes no duty to a nonclient plaintiff to effectuate the client's directive to "Do *X*" when the nonclient's claim raises a question about what "*X*" is—

16

that is, where there is a question about whether the client intended to benefit *the plaintiff* or *how* the client intended to do so. (*Chang, supra*, 179 Cal.App.4th at p. 82 [no liability to a third party "where there is a question about whether the third party beneficiary was, in fact, the decedent's intended beneficiary"]; *Boranian, supra*, 123 Cal.App.4th at p. 1018 [no liability to a third party "where there is a substantial question about whether the third party was in fact the decedent's *intended* beneficiary"].)

Because uncertainty regarding the client's intent necessarily means that the client's intent is not clear, certain or undisputed, the absence of a duty in this scenario is unsurprisingly dictated by the analysis of the factors bearing on whether to recognize a duty. When the client's intent behind the directive to "Do *X*" is anything less than abundantly clear, there is by definition greater doubt about whether the transaction between the lawyer and the client was intended to benefit the nonclient plaintiff. As a consequence, the plaintiff's injury is a less foreseeable result of the lawyer's conduct, the plaintiff's injury is less certain, the connection between the lawyer's conduct and the plaintiff's injury is less close, and it is less likely that allowing the malpractice claim to move forward would prevent future harm. (*Paul, supra*, 235 Cal.App.4th at p. 1098 [so noting].) When the client's intent is anything less than abundantly clear, it is more likely that the client's interests will end up conflicting with the nonclient plaintiff's interests, thereby placing the lawyer in an "untenable position of divided loyalty." (*Boranian, supra*, 123 Cal.App.4th at p. 1014.) What is more, courts will inevitably encounter "difficulties of proof" in resolving this conflict because the one person who can most authoritatively speak to the client's intent—namely, the client—will in all cases

17

involving testamentary interests be dead. (*Moore*, *supra*, 109 Cal.App.4th at p. 1297; *Radovich*, *supra*, 35 Cal.App.4th at p. 964.) And when the client's intent is anything less than abundantly clear, there is a greater danger of conflicting duties between competing beneficiaries as well as a greater likelihood that the lawyer will be hit with a flood of malpractice claims brought by nonclient plaintiffs asserting that the client "once promised them *X*" and the like; this potential liability would place an "intolerable" "burden" on the legal profession. (*Chang*, *supra*, 172 Cal.App.4th at p. 84.)

California courts have unfailingly rejected the existence of a duty where there is a question about "*X*." In *Ventura County Humane Society*, *supra*, 40 Cal.App.3d 897, the client directed the lawyer to designate that a charity with a specific name inherit part of her estate. When it later came to light that no charity bore that specific name provided by the client, a charity with a similar name sued the lawyer for malpractice. The court dismissed the claim, reasoning that the client's intent to benefit the plaintiff was "ambiguous," such that the plaintiff could not bring suit. (*Id.* at 902-905.) And in *Chang*, *supra*, 172 Cal.App.4th 67, the client executed a trust that named the nonclient plaintiff, but the plaintiff sued the lawyer for malpractice claiming that the client had intended to revise that trust to increase the plaintiff's share of the estate. The court dismissed the claim, reasoning that the client's intent to revise the bequest did not appear anywhere in the trust, that the plaintiff's assertion about the client's intent at best presented a "question" about the client's intent, and that simply raising a "question" about the client's intent did not meet the standard that the client's intent was abundantly clear. (*Id.* at pp. 82-84.)

18

Second, a lawyer has no duty to a nonclient plaintiff beyond implementing the client's clear directive to "Do *X*" (when, as noted above, *X* benefits that nonclient plaintiff). The lawyer has no duty to remind the client to follow through with implementing the client's directive once the lawyer has prepared the requested documents (*Radovich, supra*, 35 Cal.App.4th at pp. 954, 965 [no duty for failing to remind the client to execute a new will that the client had asked the lawyer to draft]), no duty to "urge the [client] to consider . . . alternative plan[s]" to forestall will contests by persons who would lose out once the client's intent was effectuated (*Boranian, supra*, 123 Cal.App.4th at pp. 1019-1020), no duty to effectuate an expression of intent from the client that falls short of a directive (*Hall v. Kalfayan* (2010) 190 Cal.App.4th 927, 929, 935-938 [no duty for failing to follow up with a client to see if the client wanted the lawyer to draft a new will when the client never asked the lawyer to do so, but had casually expressed a desire to change the then-existing disposition of her estate], and no duty to evaluate whether the client has the mental capacity to make a directive that disinherits the nonclient plaintiff (*Moore, supra*, 109 Cal.App.4th at p. 1290). In other words, a lawyer's duty to a nonclient does not extend to being a babysitter, a risk mitigation strategist, a sounding board, or a mental health specialist for the client. Making a lawyer liable in malpractice to a nonclient for failing to act in any role beyond the role of implementing the client's undisputed intent to benefit that nonclient is bad public policy because it places an "incentive [on the lawyer] to exert pressure on the client to complete and execute estate planning documents summarily" (*Radovich*, at p. 965), a result that contravenes the lawyer's overarching duty of loyalty to the client.

19

## II.    Analysis

Applying the principles articulated above, we conclude that the lawyers did not owe plaintiffs a duty to draft the LLC operating agreements in a way that disinherited Kenneth's children because Claire's intent to disinherit Kenneth's children from being assigned any interest in the LLCs was not, as a matter of law, clear, certain or undisputed.  We reach this conclusion for two reasons.

First, this is the conclusion mandated by the governing legal rule because the undisputed facts in this case present the scenario where there is uncertainty about the intent of Claire that plaintiffs are trying to effectuate in their malpractice claim. Claire's intent to disinherit Kenneth's children from holding any interests in the LLCs appears nowhere in the LLC operating agreements themselves (*Chang, supra*, 172 Cal.App.4th at p. 82 [intent is clear where nonclient plaintiff "was an *expressly named* beneficiary of an *express bequest*"]) and was never conceded by the lawyers (*Paul, supra*, 235 Cal.App.4th at p. 1100 [intent is clear where lawyer admits to what client's intent was]).  To the contrary, it is undisputed that Claire never told Chudd of a desire to prevent Kenneth from passing his interest in the LLCs to his children, as well as undisputed that Claire—in the 10-plus years between executing the LLC operating agreements and her death—never expressed any discontent with the terms of the LLC operating agreements.

Plaintiffs' chief response is that Claire *does* have a clearly articulated intent to prohibit Kenneth's children from receiving any interest in the LLCs.  Plaintiffs' position boils down to the following syllogism:  The LLCs and the testamentary trust are part of Claire's "integrated estate plan"; Claire expressed a clear

20

intent to disinherit Kenneth's children from her testamentary trust when she amended it in 2006; therefore, Claire had the same clear intent to disinherit Kenneth's children from taking any interest in the LLCs.

We reject plaintiffs' argument for several reasons.

To begin, the net effect of the syllogism is to require a court to infer that the intent that a person has when fixing the distribution of their property at the time of their death is the intent they have when distributing any of that property through inter vivos transfers prior to their death. But this inference is not a reasonable one. Under plaintiff's syllogism, all it takes for an inter vivos transfer of property to be part of an "integrated estate plan" is that the property be subject to distribution under a will or testamentary trust and that the inter vivos transfer made after the will or trust is created be capable of reducing the amount of estate taxes due. Yet these attributes are true of *every* inter vivos transfer: Property not transferred away through an inter vivos transfer necessarily remains part of a person's estate and hence is always subject to distribution under the person's will or testamentary trust, and an inter vivos transfer of property will necessarily remove the property from the estate and hence always reduce estate taxes. Given the sheer breadth of inter vivos transfers that would be considered part of a person's "integrated estate plan," plaintiffs' proffered inference of intent is not reasonable because people regularly transfer their property to different recipients at different points in their lives. That is precisely what Claire did here. She clearly did not want Kenneth's children to inherit any of the property left in her estate at the time of her death, but evinced no qualms whatsoever about those children getting some of the $1 million she gave to Kenneth

21

in 2012 or sharing in the life insurance proceeds that would be paid out when she died. Put differently, Claire quite reasonably had multiple different intents regarding Kenneth's children; consequently, her failure to tell Chudd that "her intention" "about inheritance" had changed between the final amendment to the trust and creating the LLCs was fully consistent with allowing Kenneth's children to receive interests in the LLCs. More to the point, and contrary to what plaintiffs repeatedly insist in their briefs, plaintiff's proffered inference is nowhere near compelling enough, by itself, to meet the high threshold necessary to create a duty that can support a malpractice claim by a nonclient plaintiff. That is because a person's intent regarding how to distribute their property when they die—even if it might allow a court to infer *some evidence* of their intent behind inter vivos transfers of their property—does not constitute evidence of a *clear, certain and undisputed* intent with regard to those inter vivos transfers.

Further, an analysis of the various factors bearing on whether to recognize a duty supports our rejection of plaintiffs' "integrated estate plan" argument. Because a person's intent regarding the disposition of their property at the time of their death is fairly weak evidence of their intent with regard to inter vivos transfers, there is greater doubt that the client intended to benefit a nonclient plaintiff with a particular inter vivos transfer merely because the client intended to benefit that plaintiff in their testamentary disposition. This greater doubt means that the plaintiff's injury is a less foreseeable result of the lawyer's conduct in effectuating the inter vivos transfer, that the plaintiff's injury is less certain, that the connection between the lawyer's conduct and the plaintiff's injury is less close, and that it

22

is less likely that allowing the malpractice claim to move forward would prevent future harm.  This greater doubt also means that it is more likely that the client's interests will end up conflicting with the nonclient plaintiff's interests.  And because the client's intent regarding the inter vivos transfer is murky when drawn solely from the client's testamentary intent, allowing a malpractice claim to exist whenever a client's inter vivos transfer deviates from the client's testamentary disposition of property would place an intolerable burden upon the legal profession by subjecting lawyers to malpractice claims by beneficiaries named in the will whenever a client takes the commonplace action of choosing to benefit different people with their inter vivos transfers than the people who will inherit from them at the time of death.  Even if we confine our analysis of burden to the burden in a given case, and even though the universe of possible third-party malpractice plaintiffs would be limited to persons named in the will, such beneficiaries will be able to sue whenever any inter vivos transfer is made after a testamentary instrument is created; this would add up to quite a burden.

Second, we conclude that the lawyers did not owe plaintiffs a duty to draft the LLC operating agreements in a way that disinherited Kenneth's children from obtaining any interest in the LLCs because such a duty would obligate the lawyers to act as a sounding board and babysitter, effectively requiring them to "second guess" Claire's otherwise clear directive.  If, as plaintiffs urge, a client's intent regarding who should inherit their property at the time of death creates an inference of the same intent for any and all inter vivos transfers, then the client's previously expressed testamentary intent would forever after operate as a sort of "super-intent" that would seemingly be controlling unless

23

and until the client affirmatively expressed a contrary intent.  So in a case, such as this one, where the client says "Do *Y*" in effectuating an inter vivos transfer, a lawyer who knows that the client's will or testamentary trust says, "Do *X*" would be obligated to ask the client:  "I know you said you wanted to 'Do *Y*' for this inter vivos transfer, but you previously said in your will or testamentary trust that you wanted to 'Do *X*,' so which is it—*X* or *Y*?"  This calls upon the lawyer to second guess the client.  What is more, it puts the lawyer in the middle of a potential conflict between the people who are the beneficiaries of *X* and the people who are the beneficiaries of *Y*.

Plaintiffs resist our analysis with what can be grouped into four further arguments.

First, plaintiffs urge that their syllogism is valid because a person's "integrated estate plan" always includes *both* their will and testamentary trusts *and* inter vivos transfers of property covered by that will or trust, such that a client is rightly presumed to have the same intent as to *all* aspects of their estate plan.  For support, plaintiffs cite *Genger v. Delsol* (1997) 56 Cal.App.4th 1410 and *Burch v. George* (1994) 7 Cal.4th 246. *Genger* and *Burch* held that a beneficiary's assertion of an interest in property that is in the decedent's estate at the time of the decedent's death triggered the "no contest" clauses contained in each decedent's will or testamentary trust.  (*Genger*, at pp. 1420-1422; *Burch*, at pp. 251-263.)   These cases do not aid plaintiffs.  To start, *Genger* and *Burch* are inapt.  They deal with the scope of express "no contest" clauses in wills and testamentary trusts, and do no more than give effect to the "uncontroverted" intent of the testator as reflected in those express clauses.  (*Burch*, at pp. 254-255, 258.)  Here, by contrast,

plaintiffs are asking us to import a testator's intent from a testamentary trust into an inter vivos transfer document that, on its face, contradicts that testamentary intent. What is more, the challenges that triggered the no contest clauses in *Genger* and *Burch* concerned properties that were still part of the estates at the time of the testators' deaths (and thus subject to the "no contest" clauses in the wills or testamentary trusts); indeed, the property challenged in *Genger* was the very "cornerstone" of the decedent's "integrated estate plan"—a plan that would have "unravel[ed]" if left open to challenge. (*Genger*, at pp. 1421-1422.) Here, by contrast, the property at issue has been *removed* from the Gordon family's estate by the inter vivos transfers at issue in this case. Thus, neither *Genger* nor *Burch* supports plaintiffs' broad assertion that everything a person does with the property they own after they make a will or testamentary trust is part of their "integrated estate plan."

Second, plaintiffs attempt to qualify their syllogism—and thereby narrow the reach of the inference of intent that it mandates—by arguing that an inter vivos transfer is part of a person's "integrated estate plan" (and hence subject to their proffered inference of intent) only where, as here, the inter vivos transfer has a "temporal proximity" to the person's earlier execution of their will or testamentary trust and where the inter vivos transfer is not "random." But how proximate in time must an inter vivos transfer be to be "temporally proximate"? And when is an inter vivos transfer "random" versus not random given that *all* transfers are necessarily intentional? These proffered "limits" on the scope of plaintiffs' inference of intent are malleable, flimsy and manipulable. They would make a lawyer's malpractice liability to nonclient plaintiffs turn on questions that

25

would inevitably be subject to factual dispute and thus could not be resolved prior to trial; it would therefore place the same intolerable burden on lawyers as plaintiffs' unlimited syllogism.

Third, plaintiffs express their disagreement with several aspects of the trial court's reasoning in granting summary judgment—namely, that the trial court erred in (1) insisting that Claire's intent be derived from the LLC operating agreements, because that insistence somehow wrongly conflates the element of duty with the element of breach of duty, and (2) focusing on the intent "element." These disagreements are both irrelevant and incorrect. They are irrelevant because our task in independently evaluating the summary judgment ruling means that we are reviewing the court's ruling and not its reasoning. (*Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 455.) Plaintiffs' disagreements are also incorrect. The trial court's insistence upon clear, certain and undisputed evidence of Claire's intent properly focuses on the very question of duty; the court was not examining the breach of duty element. Plaintiffs disagree, insisting that the clarity of the testator's intent is relevant to the *breach* element rather than the *duty* element. Plaintiffs are wrong: The cases we cite above all deal with the duty element, which is why they discuss the public policy factors that define duty (rather than the case-specific inquiry attendant to whether a lawyer's conduct in any given case breaches that duty). To the extent plaintiffs are arguing that the court erred in looking at the LLC operating agreements in a vacuum because Claire's intent to disinherit Kenneth's children would have been expressed in those operating agreements but for the lawyers' malpractice, it is *plaintiffs* who are conflating duty and breach. And plaintiffs' argument that only the intent "element" was at

26

issue rests on a misapprehension of the law:  The only "element" at issue is duty; intent is but one of many factors bearing on whether to recognize such a duty.

Lastly, plaintiffs insist that any deficiencies in their case are cured by the declaration submitted by their expert witness, which they point out was never contradicted by a competing expert declaration from the lawyers.  Plaintiffs are wrong. Plaintiffs' expert opined that (1) the LLCs "were a part of Claire's . . . integrated estate plan" and that her intent regarding the LLCs "must" therefore "be viewed in concert with the trust agreement," and (2) the lawyers "breached the applicable standard[] of care."  The first opinion effectively opines that the lawyers owe plaintiffs a duty.  We have concluded otherwise, and "it is well settled that 'expert testimony is incompetent on the . . . question whether [a legal] duty [of care] exists because this is question of law for the court alone' to decide."  (*QDOS, Inc. v. Signature Financial, LLC* (2017) 17 Cal.App.5th 990, 1004.)  The second opinion that the lawyers breached the standard of care similarly suggests that they owed plaintiffs a duty in the first place.  But that suggestion is wrong because it assumes its conclusion.  (*Issakhani v. Shadow Glen Homeowners Assn., Inc.* (2021) 63 Cal.App.5th 917, 935 ["The standard of care is relevant only if there is a duty of care for it to impose.  The standard of care *presupposes* a duty; it cannot *create* one."].)

\*     \*     \*

Because summary judgment was properly granted due to the absence of any duty running from the lawyers to plaintiffs, we have no occasion to reach the alternative grounds for affirmance (namely, that plaintiffs' claims are time barred or that Brian and Steven lack standing).

27

## DISPOSITION

The judgment is affirmed.  The lawyers are entitled to their costs on appeal.

**CERTIFIED FOR PUBLICATION.**


_____, J.
HOFFSTADT


We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST